THE WESTERN UNION TELEGRAPH COMPANY, Respondent, v. GUERNSEY & SCUDDER ELECTRIC LIGHT COMPANY, Appellant.

St. Louis Court of Appeals, June 2, 1891.

1. **City of St. Louis:** REGULATION OF THE USE OF STREETS. The city of St. Louis has the charter power to regulate the use of streets within its limits, and this power is not limited to the regulation of the use of streets for travel, but extends to other beneficial uses which the public good and convenience may from time to time require, and, among other things, to the erection of poles and stringing thereon of wires for the supply of electric light by private corporations to consumers.

2. ———: ———. Such power may be exercised both as to an adjoining owner and as to a licensee having prior rights of user, such as the Western Union Telegraph Company, and may subject either to inconvenience, so long as it does not amount to a substantial subversion of private rights. The fact, that said telegraph

company was inconvenienced, would, therefore, not render the exercise of the power illegal, so long as its rights were not substantially invaded ; but that company is nevertheless, owing to the nature of its obligations, entitled to have the rigid protection of the law thrown around the instrumentalities which are essential to the faithful performance of its duties.

3. Injunction : PLEADING. Electric light wires were erected by virtue of a municipal ordinance amidst the wires of the Western Union Telegraph Company. and, in an action brought by that company, the electric light company, which had erected these poles, was enjoined from stringing its wires on these poles within a certain distance of the wires of the telegraph company. At the trial it appeared from the evidence that it was not the intention of the electric light company to string its wires within that distance, but, although the defendant was charged with such an intention, there was no disclaimer thereof in its pleadings. It also appeared from the evidence that, at the time of the institution of the action, the poles were mortised for cross arms for wires within the distance mentioned, but that this had been done pursuant to a municipal regulation. *Held*, THOMPSON, J., *dissenting*, that, under these circumstances, the evidence at the trial in regard to the intention of the electric light company was not ground for disturbing the judgment of the trial court.

4. Evidence : TESTIMONY OF EXPERTS. The testimony of experts is at most advisory, and its weight is to be determined by the experience and knowledge, however acquired, which the trier of the facts has of the subject-matter under consideration.

5. Injunctions : RIGHT OF PLAINTIFF TO RELIEF. *Semble* that the rule that a plaintiff is not entitled to relief by injunction against a mischief, when he can guard against it at a slight expense, does not obtain in this state.

6. —— : ——. The evidence in this cause is reviewed, and it is *held*, THOMPSON, J., *dissenting*, that injunction was the proper remedy in the case, since the plaintiff's right in controversy was unquestioned and there was a fair probability of a ,substantial interference with that right, justifying recourse to a court of equity before the threatened wrong was done, and since an action for damages would not have afforded an adequate remedy.

*Per Thompson, J., dissenting :*

7. Injunctions : RIGHT OF PLAINTIFF TO RELIEF. If the act complained of is not a nuisance *per se*, but may or may not become a nuisance according to the circumstances, and whether it will operate injuriously is uncertain or contingent, equity will not interfere by injunction.

8. ———— : ————.  .When it is sought to restrain a defendant in the lawful pursuit of his business and management of his property, although not upon his own land, and it does not appear that the act or threatened act of the defendant will probably produce serious injury to the plaintiff, the injunction should not be granted ; nor should the injunction be granted when the threatened injury, though probable otherwise, can be avoided by the plaintiff by means of a precaution involving only a slight expenditure on his part.

*Appeal from the St. Louis City Circuit Court.*—Hon. George W. Lubke, Judge.

AFFIRMED.

*Boyle, Adams & McKeighan,* for appellant.

(1) An injunction cannot, under any circumstances, be granted restraining the defendant from the doing of an act, however wrongful it may be, unless it is clearly and satisfactorily shown that the defendant threatens or presently intends to do the particular thing enjoined.  Therefore, the court erred in entering a decree against appellant restraining it from stretching its wires nearer than eight feet to respondent's wires, the evidence being that appellant under no circumstances intended to go nearer than ten feet. Besides, the evidence failed to establish clearly, or at all, that injury or unreasonable interference would be caused by appellant stretching its wires nearer than eight feet.  (2) The injunction in this case is in the nature of a mandatory injunction, since by the temporary injunction and final decree perpetuating it, appellant is enjoined from generating and transmitting electricity through its wires, unless it will do something, viz., stretch a net wire work or other substitute under its wires.  This is the same thing as decreeing that it shall do the thing specified.  While courts of equity have the power to issue mandatory injunctions, it is not a power which is regarded with favor ; on the contrary,

courts of equity use it with great reluctance, and only under special circumstances, and with great caution ; its exercise is to be confined to cases where there is no other remedy. 1 High on Inj., sec. 12 ; Kerr on Inj. 230, 231 ; Drewsy on Inj. 265. Unless the damages which would ensue from withholding a mandatory injunction will be extreme, the writ should not be issued. *Durrell v. Pritchard*, L. R. Ch. App. 274; *Brewsey v. Tremaunt*, L. R. 9 Ch. App. 219. (3) The evidence in this case shows that appellant is as rightfully upon the street in question as respondent, although the respondent used the street for its business before appellant. The appellant was, and is, upon the street by virtue of lawful municipal law or ordinance. A prior user of a street has no superior right to other subsequent users. Therefore, a right of action by the former against the latter must depend upon the question of negligence. All that is required of any person using the street is reasonable use and care. *Macomber v. Metols*, 34 Mich. 212. Persons using the highway have no prescriptive rights. A highway must admit of new uses whenever the general benefit requires it. New uses are constantly arising, and private rights must yield to them. The power to regulate the use is not limited to the mere right of way, but extends to all beneficial uses which the public good may from time to time require. *Ferrenbach v. Turner*, 86 Mo. 416 ( affirming this court ); *Building Co. v. Tel. Co.*, 88 Mo. 258 ; s. c., 13 Mo. App. 447. (4) The evidence in this case on both sides showed that if any injury or damage should ever happen to respondent's property or employes from the electricity generated by appellant's dynamo machines and transmitted through its wires, such damage or injury would, and could, not happen at all when appellant's machines and wires are in their normal position, and could only result, if at all, from appellant's wires breaking from some unusual cause, or

through negligence, and the ends falling upon respondent's wires, and certain concurrent, but not inevitable or even probable, conditions being present. The evidence does not establish that the dangers apprehended by respondent as a basis for an injunction were either certain, imminent, constant or highly probable, but on the contrary the great and overwhelming weight of the testimony was, and is, that such apprehended dangers were, and are, uncertain, improbable, accidental, remote, speculative, contingent and barely possible under very unusual circumstances or conditions, or the result of negligence. Under such a state of facts a lawful business cannot be interrupted, or enjoined, or unusual or arbitrary conditions be imposed on its continuance beyond what public authority has imposed in granting it the right to enter upon, and use, the streets. A lawful business is not a nuisance, nor do the defendant's wires and business constitute a public nuisance, since the defendant is authorized by law to stretch its wires and transmit electricity through them. Wood on Nuisances, secs. 1, 15, 16; *Hinchman v. Railroad*, 2 C. E. Green, p. 75; *Gay v. Tel. Co.*, 12 Mo. App. 485; High on Inj., sec. 767. Nor should such business be interfered with by injunction under the facts of this case. High on Inj., secs. 740, 742, 752, 787, 788, 818; *Rhodes v. Dunbar*, 57 Pa. St. 274; *Building Co. v. Tel. Co.*, 88 Mo. 258; *Gay v. Tel. Co.*, 12 Mo. App. 485; *Flint v. Russell*, 5 Dill. 151; *Railroad v. Applegate*, 8 Dana, 289; *Carpenter v. Cummings*, 2 Phil. 76; *Bigelow v. Bridge Co.*, 14 Conn. 565; *Spencer v. R. W. Co.*, 8 Sims, 193; *Earl of Repin v. Hobart*, 3 Wylore & Keene, 169; *Duncan v. Hayes*, 7 C. E. Green, 25. (5) But it is clearly shown that any injury or danger which might, under any possible conditions, happen to respondent from the breaking of appellant's wires from some unusual and unprecedented storm, or some unforeseen accident, or through any possible negligence of appellant, can be avoided at small and trifling cost by the use

by respondent of a fusible plug placed on its wires near their entrance into its office. It is shown, and not contradicted, that in case of one of appellant's wires breaking and coming in contact with one of respondent's wires, and all other conditions being present necessary to cause a transmission of appellant's current of electricity over one of respondent's wires, this fusible plug would, by melting and opening the circuit, prevent appellant's current from going into respondent's office and doing any damage. The only inconvenience that would follow would be that the cause would have to be removed before the wire could be used, which would be in a very short time. An injunction against a nuisance will be granted only where there is a strong and mischievous case of pressing necessity, and not because of a trifling invasion of legal rights, or where it appears, that by a slight expenditure of money the danger or annoyance may be avoided. *Rosser v. Randolph*, 7 Porter, 233. (6) When a summary remedy is provided by statute for the abatement of the nuisance by the municipal authorities, a court of equity may properly refuse to interfere by injunction, when no obstacle is shown to be in the way of proceeding at law. 1 High, 745; *Powell v. Foster*, 59 Ga. 790. Article 3, scheme and charter, section 25, subdivision 6, provides for the abatement of all nuisances by the municipal authorities in a summary way.

*Hitchcock, Madill & Finkelnburg*, for respondent.

(1) An injunction is the most flexible of remedies. The trial court, or the appellate court, may, by its final decision, continue or dissolve, in part or in whole, or may in any manner modify an injunction already granted. *Cassidy v. Metcalf*, 66 Mo. 519, 535; 1 High on Inj., sec. 39, note 5; *Tucker v. Carpenter*, Hemp. 441. In general, relief by injunction should be granted if it appear from the whole proof, that defendant

threatens to do, or continue doing, some act complained of; or that thereby some lawful right of plaintiff will be denied or interfered with, without legal excuse therefor; and that for such threatened injury no adequate remedy is afforded by an action for damages as such, as, if it appeared that the injury apprehended would be a recurring one, requiring a multiplicity of suits for damages; and it is not necessary that such injury should be irreparable. *Towne v. Bowers*, 81 Mo. 491, 495-6; *Turner v. Stewart*, 78 Mo. 480, 482, and cases cited; *McPike v. West*, 71 Mo. 199, 200; *Bank v. Kercheval*, 65 Mo. 682; *Harris v. Board*, 22 Mo. App. 462. (2) Under the issues in this case, the decree below should be affirmed, if on the whole proof it appears that the apprehension of injury alleged by plaintiff is a reasonable one, though it be uncertain how frequently such injury will occur, or whether it may or may not, in every detail, correspond with plaintiff's averments thereof; and that, if and whenever such injury should occur, there is a real danger of serious damage to plaintiff, in respect of its property or the profitable conduct of its business, or any obstruction thereto, as authorized by said act of congress, or in respect of the safety of its employes in fulfilling their ordinary duties, or all of these; and that there is no adequate remedy therefor by an action for damages as such—whether because it would require a multiplicity of suits, or would involve a loss of profits difficult to estimate, or both. Plaintiff is entitled to relief by injunction if there be probable ground for believing that, unless such relief be granted, the injury apprehended will occur. It is no defense to urge that plaintiff can avoid such injury, at an additional expense, by some device or expedient not needed except for defendant's acts complained of; *a fortiori*, if such expedient would merely substitute one kind of injury for another, as in the case of fusible plugs. 1 High on Injunctions, sec. 22. And in determining the questions of fact

involved, including physical or natural laws, the courts will take judicial notice of "such matters of science as are involved in the cases brought before them," and may consult works on science in relation thereto. *Brown v. Piper*, 91 U. S. 42; 1 Whart. Ev., secs. 282, 335. (3) Plaintiff is entitled, under the act of congress of July 24, 1866 (R. S. U. S., sec. 5263), duly accepted by it, to maintain and operate its telegraph lines on Locust street, in the city of St. Louis, without interference by any other person with the safe and ordinary operation thereof. Said act is paramount to any state law, or municipal ordinance. That act was an exercise of the power of congress over interstate commerce, and is binding on "the judges in every state." *Tel. Co. v. Tel. Co.*, 96 U. S. 11; U. S. Const., art. 1, sec. 8, art. 6, par. 2. Any state law, though purporting to be enacted under the police power of the state, which conflicts with said act of congress, is void. The "settled doctrine" of the United States supreme court on this subject includes every attempted interference with interstate commerce, under the authority of a state. *Railroad v. Husen*, 95 U. S. 465, 470-71; *Brown v. Houston*, 114. U. S. 622, 630, 632. Defendant's alleged right, under the city ordinances of St. Louis, to erect and maintain its poles and wires in such manner as to interfere with plaintiff's right, under said act of congress, to carry on its telegraph business without interference or obstruction, would be a violation of said act of congress. A refusal by any state court to require third persons to abstain from interfering therewith would be a denial of plaintiff's rights under article 1, section 8, and article 6, paragraph 2, of the United States constitution. (4) The defendant's poles were not rightfully erected on Locust street. City ordinance number 12723 conferred no such right, for the city charter contains no authority for its enactment. On this ground alone, on the proof made, plaintiff is entitled to equitable relief. 2 R. S. 1879, pp. 1585-8;

City Charter, art. 3, sec. 26 ; 2 Dillon, Mun. Corp., secs. 660, 698, and cases cited.

ROMBAUER, P. J.—This is a suit in equity to enjoin the defendant from transmitting currents of electricity through certain wires which it has suspended in proximity to the telegraph wires of the plaintiff. At the hearing there was a decree denying the relief sought, and dismissing the petition as to a portion of the wires of the defendant, and granting the relief sought, in a modified form, as to the remainder. From this decree the defendant prosecutes this appeal.

The petition recites the incorporation of the plaintiff and its acquisition, under various acts of congress, and through its consolidation with the American Union Telegraph Company in pursuance of the laws of the state of New York, of the right to maintain its wires on any post-route, and pleads the act of congress of March 1, 1884, which makes all public roads and highways post-routes. It recites facts showing that a portion of Locust street, in the city of St. Louis, is a post-route within the meaning of this statute, and that that portion of said street between Third and Fourth streets was, on or about the year 1880, occupied by the telegraph lines of the American Union Telegraph Company, which lines afterwards became, in pursuance of the consolidation already spoken of, the property of the plaintiff. It recites that the plaintiff had, for more than four years prior to the commencement of the suit, occupied and used those lines in its business as a telegraph company ; asserts its right to continue in the use of them free from interruption or disturbance ; recites facts showing the extensive character of the plaintiff's business in transmitting messages to all parts of the United States, and the importance of such business, not only to individuals, but also to the public authorities of the city of St. Louis, the state of Missouri and the United States. It then states that more than fifty telegraph wires are

strung and supported on the plaintiff's poles on Locust street between Third and Fourth streets ; that each one is a conductor of electricity, and would, if brought in contact with any other body charged with a current of electricity, or with any other wire or conductor communicating with any other apparatus generating electricity, necessarily take up and transmit from such other body, or such other conductor, any current of electricity with which the same was charged, or which was being transmitted thereby, and would conduct such electricity into the offices of the plaintiff and into such apparatus of the plaintiff in its offices as are connected with the plaintiff's wires, endangering the plaintiff's property by burning up its telegraph instruments, setting fire to the premises occupied by its main and branch offices, and destroying the lives of its employes.

The petition then recites the incorporation of the defendant for the purpose of supplying light by means of electricity to persons in the city of St. Louis from its premises on number 306 Locust street in said city ; describes the manner by which the defendant, for the purpose of producing electric lights, generates by means of dynamo electric machines, and transmits by means of wires, powerful and intense currents of electricity.

The petition then states that within the four weeks preceding the institution of this suit the defendant erected three poles on the south side of Locust street, one hundred and fifty feet apart from each other, and higher than the plaintiff's poles, and has strung upon the poles thus erected six wires, four of them directly above, and two directly below, the plaintiff's wires ; that all of the defendant's wires are connected with its dynamos, and are used for the transmission of powerful currents of electricity to various parts of the city.

The petition also states that wires, such as are strung between the defendant's poles, are at all times liable to be broken, and that it frequently happens ( owing to causes which are enumerated ) that wires

Vol. 46—9

strung between poles so far apart are broken ; that, in case the defendant's upper wires are thus broken, they would unavoidably fall on the plaintiff's wires, and in such event it would instantly and unavoidably result that the powerful currents of electricity, generated by the defendant and transmitted through its wires, would be transmitted through one or more of plaintiff's telegraph wires, and be conducted into the plaintiff's offices, and to the telegraphic instruments and apparatus there employed by plaintiff, to the interruption of the plaintiff's business, and to the imminent danger of its property and the safety and lives of its employes.

The petition further states that the same result would follow in case the plaintiff's wires broke and came in contact with the defendant's wires strung immediately below them ; that such accidents have repeatedly occurred and are dreaded by telegraph operators and repairers of wires, causing in many instances death and personal injuries.

The petition also states that the plaintiff has requested the defendant to either remove said wires, or else so place them as to avoid the dangers aforesaid ; but that the defendant refuses to comply with such request, and intends not only to continue the use of said wires in the manner aforesaid, but also to increase said dangers by placing additional wires on its poles for like purposes. The petition concludes with a prayer for an injunction restraining the defendant in the use of said wires for the purposes and in the manner aforesaid, and for general relief.

Due notice of the application for a temporary restraining order was given, and it was heard by the court on affidavits filed both in support and in opposition thereof, whereupon the court, upon the plaintiff's giving bond in form and amount required, made a temporary restraining order, enjoining the defendant :

*First.* From transmitting any electric currents through its wires, strung *below* those of the plaintiff,

because the transmission of such currents was dangerous to plaintiff's employes, and prohibiting the defendant from stringing any more wires below the wires of plaintiff for the use of electric light wires.

*Second.* From placing for the purposes of its business any electric light wires *above* those of the plaintiff, nearer than *three feet* to plaintiff's wires.

*Third.* And ordering the defendant to place below its wires already strung 'some net work or sufficient guard to prevent its wires, in case of breakage or sagging, from coming into contact with the plaintiff's wires.

An order to that effect was served upon the defendant. More than one month after service of this order upon the defendant, the latter filed its answer, accompanied by a motion to dissolve the injunction. The answer consists first of a general denial. It then recites the incorporation of the defendant for the purpose of manufacturing and vending electric light; that its chief office and place of business was, and had for some time been, at the southwest corner of Third and Locust streets in the city of St. Louis. It states that in order to supply its customers with light it became, was, and is, necessary for it to stretch its wires on poles, erected, and to be erected, upon and along the streets of St. Louis between the southwest corner of Third and Locust streets, the place where its dynamo machines used in manufacturing said light were and are located, and the places of business of its customers where the light was and is supplied for the illumination and lighting of their places of business. It then recites the language of an ordinance enacted by the municipal assembly of the city of St. Louis on the fifteenth of March, 1884, numbered 12723, "regulating the placing of wires, tubes or cables conveying electricity for the production of light and power along the streets, alleys and public places of the city of St. Louis." This ordinance, which is embodied in the answer, will not be

set out in full, but its provisions will be referred to, so far as may be necessary for the purpose of disposing of the questions arising upon this record. The answer next recites that afterwards the board of public improvements of the city of St. Louis adopted a series of rules and regulations with respect to the matters contained in said ordinance, which rules and regulations are also set out in the answer. These in like manner will be omitted, but their provisions will be referred to, should it become necessary in the course of this opinion.

The answer then proceeds to state that the defendant applied to the board of public improvements for permission to erect its poles and stretch its wires on the north side of Locust street, which permission was denied ; that the defendant did obtain the permission of said board to erect its poles and stretch its wires on the south side of Locust street, and did so in strict conformity with the ordinances of the city, and the rules and regulations of the board, and under the supervision and control of the street commissioner ; that its wires are stretched in the best practical way, are new and thoroughly insulated by asbestos and fireproof material ; that it is impossible for any of said wires to sag or sway so as to touch the wires of plaintiff, and that it is altogether improbable that any of said wires will break in any of the usual weather or condition of the elements in St. Louis.

The answer further states that, if said wires, or either of them, should break asunder and fall so as to come in contact with plaintiff's wires, it would be harmless, as the fracture would necessarily break the current of electricity so that no damage would be done. The answer concludes with a prayer for a dissolution of the injunction, and judgment for costs.

The plaintiff replied, admitting the defendant's incorporation as stated, and the enactment of the city ordinance set out in the answer. The reply disclaimed information of the regulations of the board of public

improvements, and of the fact whether the defendant, in what it did, conformed to the provisions of the ordinance, and the regulations of the board, if there were any. The reply further stated that neither the city, nor any municipal officer thereof, had power to authorize defendant to erect and maintain its poles and wires so as to interfere with the plaintiff's rights under the act of congress, and averred that the alleged claim of right of the defendant under the statute of this state, the ordinances of the city and the regulations of the board, was contrary to, and a denial of, plaintiff's rights under the act of congress and the constitution of the United States.

It must be noticed in this connection that, while the defendant was fully advised both by the plaintiff's petition and by the order of court that it had strung its wires both above and below those of the plaintiff, and was charged with the intention of not only continuing the use of its wires as thus strung, but also of stringing additional wires, regardless of any intervening space both above and below, the defendant did not disclaim either in its answer; or in the motion to dissolve, or, as far as the record shows, in the affidavits accompanying it, the intention thus charged.

Upon the final hearing the court modified the preliminary restraining order by removing the restraint as to defendant's lower wires altogether. This decision was not placed on the ground that the operation of such wires, if continued, would be less dangerous to the plaintiff's business or employes than the operation of the upper wires, but upon the sole ground that, prior to the institution of the suit, the plaintiff was advised that these wires were strung merely for a temporary purpose. The residue of the injunction, the court modified by enlarging the space which was to intervene between the defendant's and the plaintiff's wires, from three to eight feet. The injunction, as thus modified, was made perpetual.

The defendant assigns for error, in substance, that the court erred in granting to plaintiff a temporary injunction and in making it perpetual, and particularly in restraining defendant from stretching its wires nearer than eight feet to plaintiff's wires, when the evidence failed to show, except by remote inference, any design on part of the defendant to stretch its wires nearer than ten feet to those of the plaintiff.

The city of St. Louis under its charter has power to "construct and keep in repair all bridges, streets, sewers and drains, and to regulate the use thereof" (Charter, art, 3, sec. 24, clause 2), and, also, to pass all such ordinances, not inconsistent with the provisions of the charter, or the laws of this state, as may be expedient in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures, and to enforce the same." Clause 14. "The power *to regulate the use,*" says BLACK, J., in *Ferrenbach v. Turner*, 86 Mo. 416, "is not limited to a mere right of way, but it extends to all beneficial uses which the public good and convenience may from time to time require, as for laying gas, water and sewer pipes, and the like. New uses are constantly arising. All these, and many others, may be made of the streets without the consent of the lot-owners. Private rights must yield to them." In *Julia Building Ass'n v. Tel. Co.*, 13 Mo. App. 477, we held that the dedication or condemnation of public streets in a city does not limit their use to the purpose of passways for persons and vehicles, but extends to every use which may advance the public comfort and convenience within the legitimate sphere of municipal regulation. This decision was affirmed by the supreme court (88 Mo. 258), that court holding that "as civilization advances, new uses may be found expedient." The first of these cases was the case of a licensee, and the last that of an adjoining owner. We are, therefore, justified in assuming that there is no substantial difference in principle between the case of a

licensee and that of an adjoining owner, and that the rights of each are subject to additional legitimate uses, which the city may make of the streets, even though such uses cause inconvenience to either, so long as they do not amount to a substantial subversion of private rights.

If then the streets of the city of St. Louis may lawfully be subjected to the servitude which the defendant claims, the power to regulate such a use is directly conferred by the provision of the charter above quoted. The servitude which the defendant claims being a proper municipal use, it is equally evident that the power is properly exercised under the charter by the board of public improvements under the ordinance set out. Courts cannot undertake to exercise a general superintendence over this matter, because they possess neither the technical knowledge nor the knowledge of detail which the subject requires, and because the delays, which necessarily attend judicial proceedings, would of themselves furnish a conclusive argument against such exercise. When, therefore, the defendant has shown by its answer and evidence that it has erected its poles and wires in the places and manner prescribed by the municipal authorities, and that the purpose for which the same are used is a proper municipal use to which the street may be subjected, it has made a *prima facie* case that its occupation of the street to the extent and in the manner aforesaid is lawful, and it is upon the plaintiff to overthrow such case. All this, the defendant has shown by its answer and evidence.

We take these preliminary observations in view of the claim made in the plaintiff's reply, that neither the city, nor any municipal officer thereof, had power to authorize the defendant to erect and maintain its poles and wires so as to interfere with the plaintiff's rights under the acts of congress. If, by this claim, the proposition is sought to be asserted, that because the plaintiff has occupied the south side of Locust street between Third and Fourth streets with its telegraph wires, it could

by such prior occupation exclude the city and its
licensees from using said part of the street for other
municipal uses, even if by so doing the plaintiff was
subjected to some inconvenience, the claim must be
denied. If on the other hand by such claim nothing
further is sought to be asserted than the proposition
that, the plaintiff being a prior licensee on the street,
and as such in the exercise of legal rights and duties,
its rights could not be substantially invaded by a subse-
quent licensee of the city, the claim is correct. The
plaintiff's rights and duties under national and state
laws have indeed a material bearing in the determina-
tion of the question as to what interference is substan-
tial enough to warrant the interposition of a court of
equity, but have no bearing whatever in determining
the exclusiveness of the plaintiff's right of occupation.
As far as the exclusiveness of the right is concerned the
plaintiff occupies simply the position of a prior licensee,
and as such its rights cannot be of an exclusive char-
acter.

The evidence shows that, at the time of the com-
mencement of this action, plaintiff had on the south side
of Locust street five telegraph poles, one at the corner of
Third and Locust streets, one at the corner of Fourth and
Locust streets, and three intervening ; that these poles
were not exactly the same distance apart, the distance
varying from forty to sixty feet ; that, including the parts
which were inserted in the ground, they were forty-one or
forty-two feet in length ; that upon each pole there were
four cross-arms, commencing fifteen or eighteen inches
below the top of the pole, and being placed at about that
distance apart downwards; that there were eight pins
of wood on each cross-arm for the support of wires, four
on each side of the pole ; and that on each there was
screwed a glass insulator to which a wire was fastened.
To the cross-arms were attached more than fifty wires,
employed by the plaintiff in the conduct of its telegraph
business. This business consisted in transmitting by

electricity, for hire, messages of all kinds to many parts of the United States, and to foreign telegraph lines.

After the plaintiff had placed these poles and wires thus in position and use, the defendant, acting under a permit procured from the board of public improvements, which was granted to it in pursuance of the ordinance set out in the defendant's answer, and the regulations of the board of public improvements also there set out,—and after giving bond to the city in the sum of $20,000, as required by section 10 of the ordinance,—erected three poles on the south side of Locust street for the purpose of conducting electric light wires from its dynamos, which were situated in the basement of its building at number 306 Locust street. These poles were sixty feet in length, and were inserted seven feet in the ground. The first was erected at the corner of Third and Locust streets, and may be laid out of view, because no electric light wires were attached to it. The second was erected near the middle of the block, and near the defendant's building, number 306 Locust street, and the third was erected on the corner of Fourth and Locust streets, a distance of one hundred and twenty-six feet west of the second. These poles were erected substantially in line with the poles of the plaintiff. They rose up through the plaintiff's wires and extended upward much higher than the plaintiff's poles. They were mortised for cross-arms, the mortises beginning a foot below the top of the poles and running, with intervals of less than eighteen inches, three feet below the plaintiff's lowest cross-arms. At the commencement of this action the defendant had stretched four wires from the second of these poles, which stood near the middle of the block, westward to the third, which stood at the intersection with Fourth street. These wires were stretched on the highest cross-arm, and were fourteen or fifteen feet above the highest wire of the plaintiff. The defendant had also stretched two

wires running on brackets below the plaintiff's wires. All these wires were copper wires, known in the trade and to electricians as "number 6 underwriters' wire." They were insulated by a covering of cotton, and outside of that a coating of asbestos paint. The testimony tends to show that while this is not a perfect insulator, because there are no perfect insulators, yet it is the best practicable one which had been brought into use. Over these wires the defendant sent powerful currents of electricity to supply certain light to its customers, by means of two electrical machines called dynamos, established in the basement of its building. These dynamos were of unequal power, one of them being capable of generating and transmitting a current of electricity of twelve hundred and fifty volts, while the other was capable of generating and transmitting one thousand volts. The evidence tends to show that, if a current of the intensity of one thousand volts were to pass through the body of a man, it would kill him; that a current of half this intensity might in some cases have the same effect; and that if such a current were communicated to one of the plaintiff's wires, it would probably burn the electric instruments with which the wire connected, and possibly set fire to the contrivance of the plaintiff called the switch-board, with which its wires are connected on entering its offices; but we do not understand the testimony as showing that this *would necessarily* endanger the plaintiff's employes, engaged in manipulating its telegraph instruments, although it *might* possibly do so. Several instruments belonging to the plaintiff had been burned by electric light wires coming in contact with its telegraph wires; but no damage of this kind had accrued from the defendant's wires, which were in use but a comparatively short time. These casualties had generally arisen from accidental contact between electric light wires and the plaintiff's telegraph wires, where they crossed each other in very close proximity,—but a few inches apart.

Evidence was given by the plaintiff of two accidents, which were probably traceable to currents communicated by electric light wires. One of them was the burning of the Bell Telephone Company's exchange in the fifth story of the Third National Bank building in the city of St. Louis. The other resulted in the death of one of the plaintiff's linemen in the city of Pittsburg. The evidence concerning these two accidents was hypothetically stated to various expert witnesses, eliciting various opinions and theories. The sum of this class of evidence adduced by the plaintiff is, that there is undoubtedly danger, and very considerable danger, from the improper use of electric light wires in connection with telegraph wires, or from a contact between the two, or from an electric light wire coming in contact with a man. That the destruction of plaintiff's wires or instruments would cause a material interruption of its business, is substantially conceded by all the testimony, as well as the fact that the plaintiff's employes, in repairing plaintiff's wires, were liable to come into contact with the defendant's lower wires, and thereby incur great bodily risk.

The decree of the court, it will be perceived, relates entirely to such wires as the defendant may be supposed to have intended to stretch *above* the wires of the plaintiff. As to those which were temporarily stretched *below*, and as to any which the defendant may be supposed to have intended to stretch below, the decree grants no relief. As to any wires of the defendant *above* the plaintiff's wires, the decree contains two prohibitions: *First.* Against extending any wires nearer to the plaintiff's wires than eight feet. *Second.* Against maintaining any wires above the plaintiff's wires, without placing thereunder a wire net work, or other safe and suitable guard, to prevent defendant's wires from sagging or falling on the wires of the plaintiff, or coming nearer thereto than eight feet.

The dangers which the plaintiff seeks to avoid are threefold : *First.* The transmission of powerful currents of electricity from defendant's wires to plaintiff's wires by actual contact, in consequence of the sagging or breaking of the defendant's wires. *Second.* The disturbance of the electric current upon the plaintiff's wires, by induction from the defendant's wires. *Third.* The dangers to the plaintiff's employes by coming into actual contact with the defendant's lower wires.

Touching the danger of actual contact by sagging, the defendant gave evidence tending to show that it was not its intention to string its wires closer than ten feet to plaintiff's wires from above, and that, with wires strung at such distance, a contact by sagging is next to impossible. It was shown that the defendant's employes, as well as those of the city, were charged with a continuous duty of inspection, rendering such a contact highly improbable. In reply to the argument it may be said that as to defendant's intention the plaintiff had a right to act on appearances, unless otherwise advised, when it applied for the relief. The defendant's poles, as shown above, were mortised for cross-arms at close intervals where they passed through the plaintiff's wires. While such mortising may have been done rather in compliance with the regulations of the municipal board, than with any intention of actual use of the cross-arms which might be inserted for electric light wires, the answer makes no disclaimer of the defendant's intention to use them according to appearances. In view of the fact that no such disclaimer was made, the decree of the court, prohibiting the defendant from stringing its wires nearer than eight feet above those of the plaintiff, if tenable on other grounds, was warranted. It is not apparent how the defendant can complain of that part of the decree, since it simply gives a binding effect to its intention in that behalf. The question at most is a question of costs, which the

defendant could easily have avoided by filing a formal disclaimer.

The danger of contact by breakage, as appears from the evidence, may be caused either by the defendant's wires breaking and falling on those of the plaintiff strung below, or by the plaintiff's wires breaking and falling on those of the defendant below. The latter is far more likely to happen than the former, since the plaintiff's wires are of iron, of slight dimensions and subject to rust, while the defendant's wires are copper, are thoroughly insulated, and are thicker and stronger. While the danger of the breakage of the defendant's wires is not excluded by the testimony, it is doubtful whether such a contingency is sufficiently proximate to warrant that part of the decree, which requires a network or other protection to be placed below the defendant's upper wires to prevent their contact with the plaintiff's wires in case of breakage. On that question, for the reason hereinafter stated, we need express no opinion, as, under the existing facts of this case, the question is not as to the form of relief actually granted, but as to whether the plaintiff was entitled to equitable relief by injunction at the date of the institution of the suit.

As to the results which would follow in case of a breakage and contact between an electric light and a telegraph wire, the testimony is far from satisfactory. The expert testimony of the defendant tends to establish the theory that, if an electric light wire breaks, the current at once ceases to flow over it, unless the separate parts should fall so as to form two grounds; that if both of the broken wires, not protected by the insulated covering, should touch the ground the current would continue to flow, but, if one end only should touch the ground, the only consequence would be the cessation of the flow of the current from the dynamo. The attention of a number of these witnesses was, on cross-examination, called to occurrences which were testified to by eye-witnesses, and which they could not

satisfactorily explain on the two-ground theory. It is manifest from all of the evidence that either the theory itself is not thoroughly sound, or else that the conditions which bring about the formation of a second ground are so little known, that they constitute a hidden danger which cannot be guarded against. In view of the notorious fact that hundreds of fatal accidents have happened by contact with electric light wires during the comparatively short time they are in use, many of them by breakage, and many of them in this city; and in view of the further fact that such dangers are generally recognized by scientists, it avails little that expert testimony can be found to the effect, that the danger is opposed to a certain theory, and, therefore, is nominal and remote. Expert testimony is at most advisory, and its weight is determined by the experience and knowledge, however acquired, which the triers of the fact have of the subject-matter under consideration. Weighing the evidence in light of all these facts, we must conclude that, even as to the danger which might arise from a probable breakage of wires, the circumstances at the date of the issue of the restraining order were such as to justify the equitable interposition of the court.

It is in this connection that the plaintiff's rights and duties as fixed by law become material. The plaintiff is a carrier in the service of the public, and its duties as such are regulated by law and enforced by the severest penalties. It is answerable in these penalties for any neglect in the speedy and accurate transmission of messages intrusted to its care. The fact that such messages are delayed or inaccurately transmitted, owing to an interruption of the electric current over its own wires, by causes over which it has no control, may be a defense, but it is one which in many cases it would be impossible for it to establish to the satisfaction of the triers of the fact. The plaintiff, therefore, has a right to insist that a rigid protection of the law should be

thrown around the instrumentalities, which are essential to the faithful performance of its duties. The defendant is a mere volunteer. It makes whatever contracts it pleases with customers of its own selection, and even in cases of breach is answerable for ordinary damages only.

The argument has been advanced, and has been strongly pressed on our attention, that this danger to the plaintiff's instruments and operators might be avoided by inserting a device known as a fusible plug in the plaintiff's wires, where the same enter into the plaintiff's office. It is shown that such a plug melts if acted upon by an intense electric current, and that the plaintiff, by the insertion of such plugs, might guard against the danger of such intense currents passing by contact from the defendant's wires over its own, and entering its offices to the danger of its instruments and employes. It is evident, however, that such a device, even if it accomplished all that the defendant claims for it, could be only a partial remedy. It might protect the plaintiff's employes and instruments, but it would at the same time cause an interruption of the plaintiff's business by severing its wires at every place where the plug has melted. We must add in this connection however that the equity rule, recognized in some of the states, that a plaintiff is not entitled to relief by injunction against a mischief, when he can guard against it at a slight expense, has not met with the approval of our supreme court. In *Paddock v. Somes*, 14 S. W. Rep. 749, that court approvingly cites the following passage from Wood on Nuisances [2 Ed.] 506 : "It is the duty of every person or public body to prevent a nuisance, and the fact that the person injured could, but does not, prevent damages to his property therefrom is no defense either to an action at law or in equity." The trial court in that case instructed the jury that the plaintiff could not recover, if he could have prevented the injury by a reasonable exertion and at a trifling expense, and its

judgment was reversed for error, one of the grounds being the giving of this instruction.

Our statute provides ( R. S. 1879, sec. 2722 ):   "The remedy by writ of injunction or prohibition shall exist in all cases, where an injury to real or personal property is threatened, and the doing of any legal wrong what-ever, whenever in the opinion of the court an adequate remedy cannot be afforded by an action of damages."

Judge HOUGH in *Carpenter v. Grisham*, 59 Mo. 251, says that, even in respect of nuisances, "the modern doctrine of courts of equity is much more liberal than the ancient, and that the rule requiring the right to be first established at law prevails only *where the right itself is in dispute*, or is doubtful," citing High on Injunctions, section 516.   Judge HENRY in *State Savings Bank v. Kercheval*, quoting the statute, says :   "Would an action for damages here have afforded an adequate remedy, is the question, and not whether the threatened injury would have been irreparable."   In *Overall v. Ruenzi*, 67 Mo. 207, Judge NAPTON says :   "It is quite apparent that of late years, whether by reason of our statute in regard to injunctions first introduced in the revised code of 1865, or upon general grounds of expe-diency, this court has been disposed to regard with favor proceedings which are preventive in their charac-ter, rather than compel the injured party to seek redress after the damage is accomplished."   So in *Parks v. People's Bank*, 97 Mo. 132, Judge BARCLAY holds that the remedy by injunction exists, even though the plaintiff have a legal remedy, if the remedy is not as full and adequate as that afforded by injunction.   In fact quite a number of decisions, both of the supreme court and of this court of late years, whether in view of our statute or for other reasons, have so extended the remedy by injunction, that decisions of English courts and those of other states are of very little value, in determining in what cases it does or does not exist.

Upon a review of the entire evidence we find that the case is not one wherein, in the language of some of the courts, the injury is so doubtful, eventual or contingent, as to furnish no ground for relief by injunction. The plaintiff's right is unquestioned, and the evidence shows a fair probability of a substantial interference with that right, so as to justify the plaintiff in invoking the protection of equity before the threatened dangers have culminated. The circumstances sufficiently show that, in the latter event, an adequate remedy would not be afforded by an action of damages. Whether the decree finally rendered is one which should be upheld in all its parts, or whether it might advantageously undergo modifications, is an inquiry which, under existing circumstances, is of a mere speculative character. While we are not officially advised that the conditions under which the decree was rendered have changed since its date, it is a notorious fact, well known to each member of this court, that since said date both the plaintiff's and defendant's buildings and the defendant's dynamos have been destroyed by fire; that the defendant has ceased to do business, and that the plaintiff's main office has been removed to a different street. Under these circumstances, a modification of the injunction would be a mere *brutum fulmen* subserving no useful purpose.

As far as the questions involved in the proceeding are concerned, they have been fully discussed in the opinion; and, as far as the question of costs is concerned, which now seems to be the only question needing adjudication, it is sufficiently disposed of by our holding, that the plaintiff was entitled to injunctive relief when the decree was rendered. Without committing ourselves to the propriety of the decree in all its parts, if it were still an issue in the case, we are of opinion that justice is best subserved by affirming it. Judgment affirmed; Judge BIGGS concurs; Judge THOMPSON dissents.

The W. U. Tel. Co. v. Guernsey & Scudder Light Co.

THOMPSON, J. (*dissenting*).—I agree with much of the reasoning of the foregoing opinion, but not with all of it ; and I do not agree with its result. My chief reason for not agreeing to the result is that the holding, that the plaintiff was entitled to any equitable relief in this case, sets a precedent for enjoining a large portion of the electric light wires in the city. For proof of this, we have only to use our eyes on almost any street, and especially in the business portion. My associates in their opinion disclaim an ability on the part of the courts to superintend the electric wires so as to prevent interferences, and yet they render a judgment which in itself involves an exercise of such a jurisdiction ; and this upon two grounds : *First.* At the time when this suit was brought, the defendant had strung two wires below the wires of the plaintiff, which are shown to have been intended for the mere temporary purpose of its display at the exposition. *Second.* That, although their wires, which were strung above the wires of the plaintiff, did not approach the plaintiff's wires nearer than fourteen feet, yet, as the poles had notches on them, on which cross-bars *might* be placed and wires strung near enough to the plaintiff's wires to constitute an interference, this made that part of the decree harmless to them, although they never intended to come within ten feet of the plaintiff's wires, and although the reason why the poles were notched is fully explained by the evidence. A conclusion that will justify on these grounds a harassing litigation, involving the defendant in an interruption of its business and a large amount of costs, does not comport with my idea of equity. My idea is that, notwithstanding our statute relating to injunctions, the right to an injunction still remains a matter of justice and conscience, and that it is not a mere technical matter, like a common-law action of trespass. I also think that corporations are bound to the same offices of good neighborhood as individuals; and that one corporation ought not to be allowed to go

into a court of equity, and get an injunction against the doing of an act by another corporation, when by stepping into the door of the latter it can be learned that it is not intended to do that act. In this case the business of the defendants has been interfered with by an injunction, not because they have inflicted, or intended to inflict, any injury upon the plaintiff, but because a man in the woods, without special instructions, in getting out some poles for electric light wires, cut certain notches on them in the regular way in which such poles were got out; and because a lawyer omitted to insert in an answer to a bill in equity a disclaimer of an intent on the part of the defendant to suspend wires below those of the plaintiff, when none had been suspended, except for a casual and temporary purpose; and all this, when the evidence does not show that either of them interfered with the plaintiff in conducting its business, or incommoding it, or endangered it, except in some remote and improbable contingency. As to these lower wires, the trial court has found that there was no cause for an injunction; that finding is not appealed from, and I do not understand that there is anything under this head for us to consider.

The view taken by my associates seems to involve a misapplication of the principles on which courts of equity grant or refuse injunctions to restrain threatened injuries, such as those complained of in this case. The settled rule is that, if the act complained of is not a nuisance *per se*, but may or may not become a nuisance according to circumstances, and whether it will operate injuriously is uncertain or contingent, equity will not interfere by injunction until the question is settled at law. 3 Pom. Eq. Jur., sec. 1350; 1 High on Injunc., sec. 745; Kerr on Injunc., 340; numerous cases cited in 73 Am. Dec. 114. A few quotations from judicial decisions will better illustrate the scope of the rule. Lord HARDWICKE, the founder of the present system of equity jurisprudence, expressed it thus: "Bills to

restrain nuisances must extend only to such as are nuisances at law ; and the fears of mankind, though they may be reasonable, will not create a nuisance.'' *Anon.*, 3 Atk. 750, quoted and applied in *Carpenter v. Cummings*, 2 Phila. 74, and in *Rhodes v. Dunbar*, 57 Pa. St. 274 ; s. c., 98 Am. Dec. 221, 226. ''That a thing may possibly work injury to somebody, is no ground for injunction. If the injury· be *doubtful, eventual or contingent*, equity will not interfere by injunction.'' *Rhodes v. Dunbar, supra ; Butler v. Rogers*, 9 N. J. Eq. 487. ''It is also very material to observe, what is indeed strong authority of a negative kind, that no instance can be produced of the intervention by injunction, in the case of what we have been regarding as eventual or contingent nuisances.'' Lord BROUGHAM, in *Earl of Ripon v. Hobert*, 3 Milne & K. 169 ; s. c., Coop. Temp. Brough., p. 333. ''Where the thing sought to be restrained is not unavoidable and in itself noxious, but only something which may, according to circumstances, prove so, the court will refuse to interfere until the matter has been tried at law, generally by an action, though in particular cases an issue may be directed for the satisfaction of the court where an action could not be framed so as to meet the question.'' *Ib.* One court has expressed the rule in even stronger terms, where the purpose of the action was to restrain a proprietor in a lawful use of his own land : ''Every doubt should be solved against the restraint of a proprietor, in the use of his own property for a purpose seemingly lawful, and conducive both to individual gain and the general welfare. Relief by injunction is so severe in its consequences, that it is not to be granted in such a case, except where the right to it is clearly and conclusively made out. To interfere with one's right to use his own land for the production of what he pleases, in a case of doubt, would be a flagrant abuse of power. It is not enough to show a probable and contingent injury, but

it must be shown to be inevitable and undoubted." *McCutchen v. Blanton*, 59 Miss. 116. The same principle must apply, *mutatis mutandis*, in the case where it is sought to restrain by injunction a person or corporation in the lawful pursuit of its business and management of its property, although not upon its own land. It is not, however, necessary, and especially in view of the modern tendency to enlarge the scope of preventive remedies, to go to the length of holding that, in order to warrant relief by injunction in such a case as the one before us, the apprehended mischief must be shown to be inevitable and undoubted. We really have no occasion, for the purposes of this case, to apply a rule more severe than the rule, that the plaintiff is entitled to an injunction, if what the defendant has done, or is about to do, will *probably* produce serious injury to the property of the plaintiff, or will endanger the lives of its employes, or seriously interrupt its business. That a case has not been made out by the evidence which satisfies this principle, I am clear of doubt.

The decree of the court, it will be perceived, relates entirely to such wires as the defendant may be supposed to have intended to stretch *above* the wires of the plaintiff. As to those which were temporarily stretched *below*, and as to any which the defendant may be supposed to have intended to stretch below, the decree has made a final disposition in favor of the defendant, and the plaintiff does not appeal. As to any wires of the defendant *above* the plaintiff's wires, the decree contains two prohibitions : *First.* Against extending any wires nearer to the plaintiff's wires than eight feet. *Second.* Against maintaining any wires above the plaintiff's wires, without placing thereunder a wire net-work, or other safe and suitable guard, to prevent defendant's wires from sagging or falling on the wires of the plaintiff, or coming nearer thereto than eight feet.

It has been justly observed by the learned counsel for the plaintiff in their printed argument that an injunction suit may be defended on the ground, either, *first*, that the defendant does not intend to do or continue the injurious act apprehended ; or, *second*, that, if done, it will not injure the plaintiff as claimed ; or, *third*, that the defendant has a lawful right to do it, even to the plaintiff's injury. I think that on the first of these grounds the evidence fails to support the decree. I find no evidence showing that the defendant ever intended to maintain any wires within eight feet of the plaintiff's wires. On the contrary, the testimony of Mr. Guernsey, the defendant's vice-president and manager, is distinctly to the effect, that it was the purpose of the defendant never to extend its wires nearer to the upper wires of the defendant than ten feet. This evidence is not directly contradicted, but an attempt is made to avoid its effect by appealing to the fact, that the three poles which the defendant erected on Locust street had fifteen notches for cross-arms cut upon them, extending from near the top downwards at a distance of seventeen and a half inches apart, the lowest of which notches was considerably below the lowest of the plaintiff's wires. But the evidence shows clearly that this was done to comply with a regulation of the board of public improvements, made under the ordinance pleaded in the answer, without which the defendant was prohibited by the board from erecting its poles and extending its wires at all. The ordinance contains this language: "Sec. 1. That no wires, tubes or cables conveying electricity for the production of light or power, shall be placed along or across any of the streets, alleys or public places in the city of St. Louis, except as hereinafter provided." Several succeeding sections provide for the filing of applications and the granting of permits for the erection of such wires, tubes or cables ; and, then, comes the tenth section, which provides, among several other things, which need not be noticed,

that the person or corporation availing itself of the privileges of the ordinance shall file an acceptance with the city register and a penal bond in the sum of $20,000, "that he or it will comply with all the regulations made by the board of public improvements, having reference to the subject embraced in this or any other ordinance for the purposes herein named." The evidence shows that such acceptance and bond were filed by the defendant with the city register as thus required. It further appears that the regulation, established by the board of public improvements under this ordinance, contained the following provisions in regard to granting permits: "No permit shall hereafter be granted for the erection of poles, unless the party making the application shall, in writing, agree: *First.* To erect poles of such dimensions as to admit of at least fifteen cross-bars of the usual size, at the ordinary distance, being placed thereon, except by special permission of the board. * * * *Third.* That it will grant to any other company, requiring electric light wires for its business, the right to use one or more of the cross-bars on its poles, at an annual rent of forty cents for a half cross-bar, and sixty cents for full cross-bar, except in cases where a party asking for room on another company's poles is itself charging that company a higher rent per cross-bar on its own poles heretofore erected, in which case an equal rental may be demanded for wires on the poles erected under these rules." Another rule of the board of public improvements, under the head of "rules for the guidance of the board," is as follows: "No permit shall be issued for more than one line of poles on any street, as long as the wires of the different parties can be accommodated by the poles of one line, under the regulations above stated. No permit for a third line of poles shall be given, except in case both sides of a street are already occupied by poles, erected under former permits, owned

by parties who refuse to comply with the above regula-
tions ; such parties not being entitled to the privilege
of using the poles erected by companies which conform
to those regulations." The evidence shows that, when
these poles were got out for the defendant, no instruc-
tions were given to the contractor as to notching them,
but that he notched them as he did merely for the
purpose of complying ( as he supposed ) with the ordi-
nance, but really with the above regulations, made by
the board of public improvements. The evidence,
therefore, does' not indicate a purpose on the part of
the defendant to string its wires within eight feet of
the plaintiff's wires, or nearer than ten feet of them.
There was, therefore, no ground afforded by the evi-
dence for so much of the decree as was intended to pre-
vent the defendant's wires from being placed nearer to
the plaintiff's wires than eight feet.

It remains to inquire upon the evidence whether
there is reasonable ground for apprehending that the
defendant's wires, although stretched above the plain-
tiff's wires at a distance of ten feet or more, would, in
consequence of accidental circumstances, be likely to
come into contact with the plaintiff's wires, or to come
so near to them as to work substantial detriment to the
plaintiff's property or business. The dangers which the
plaintiff apprehends are two-fold : *First*. The trans-
mission of powerful currents of electricity from the
defendant's wires to the plaintiff's wires by actual con-
tact, in consequence of defendant's wires *sagging* or
*breaking*. *Second*. The disturbance of the electric
currents upon the plaintiff's wires by induction from
the defendant's wires. I shall speak of these elements
of danger separately.

And, *first*, as to the danger of *sagging*. The evi-
dence satisfies me that if, without breaking, one of the
defendant's wires should sag so low as to come in con-
tact with one of the plaintiff's wires, and if at the point
of contact the insulating covering should be worn from

the defendant's wire, or if the weather should be wet, so that the covering would lose a portion of its insulating property, a current of electricity might be transmitted to the plaintiff's wire sufficiently strong to set fire to one of its switch-boards, or to a telegraphic instrument, unless the plaintiff should protect itself from such consequences by the use of a device called a fusible plug, which will be hereafter spoken of. But the evidence satisfies me that such a sagging is extremely improbable. The evidence tends to show that the limit of sagging of electric light wires, in this climate, between the points of greatest contraction from cold, and greatest expansion from heat, is not greater than from one foot to twenty inches, where the poles are not more than one hundred and twenty-five feet apart. There is some opinion evidence that it might be greater; there is also evidence that it would probably be less. The evidence also shows that the defendant and other electric light companies have men in their employ whose duty it is to inspect the wires, and to take up the slack whenever it is necessary to do so, and that the defendant's wires are inspected twice each day. The evidence shows that there is also in the street department of the city of St. Louis an inspector of electric wires, whose duty it is to notify the proprietors of such wires, whenever excessive sagging or any other defect is discovered. I must conclude on the whole evidence that any danger to the plaintiff's wires from the sagging of the defendant's wires is extremely improbable.

*Secondly*, as to the *breaking*. On this subject there is a general current of testimony in one direction. The sum of it is that, while telegraph wires frequently break, electric light wires have never been known to do so. No instance is given by any witness of the breaking of an electric light wire, while the testimony of the plaintiff's witnesses is to the effect, that the breaking of their telegraph wires is one of their regular sources of trouble. The reason is found in the difference between

the two metals, copper and iron. The electric light
wires are all of copper; the telegraph wires are gener-
ally of iron. Copper does not rust, in the sense in
which the word is commonly employed, though it oxid-
izes slowly when exposed to the weather. From this
its insulating cover measurably affords protection to an
electric light wire. Telegraph wires, on the contrary,
are not generally insulated; though they are to some
extent protected from rusting by a coating of zinc.
This does not, however, protect them from rust perma-
nently, but they rapidly diminish in size in St. Louis,
so that their life is but four or five years. Moreover, if
a flaw exists in a telegraph wire, the rust attacks it
there, and rapidly weakens it at that point. The dan-
ger of telegraph wires breaking and falling is, therefore,
so great, and that of electric light wires breaking and
falling so small, that one of the plaintiff's principal
witnesses expressed the opinion that electric light wires
were more dangerous to the plaintiff, when strung below
the plaintiff's wires, than above them.

There is an equal concurrence in the scientific
testimony as to the consequences, which would follow
in case of the breaking of one of the defendant's wires,
suspended above those of the plaintiff. An important
difference between currents transmitted over tele-
graph wires, and those transmitted over electric light
wires, consists in the fact that telegraph wires are
"grounded," as it is called, while electric light wires are
not "grounded." The testimony shows that electricity,
if, as has been supposed, it is a substance, *travels* in a
circuit, and if, as is supposed by some, it consists
simply of a form of energy acting from one molecule of
matter to another, *acts* in a circuit. In the case of
telegraph wires, both ends are "grounded," and the
earth completes the circuit according to theory; but
in the case of electric light wires, neither end is
"grounded," but the wire goes out, performs a circuit
and returns to the dynamo, and the dynamo is not

grounded but is carefully. insulated from the ground. Now the testimony shows that, if an electric light wire breaks, the current at once ceases to flow over it, unless the separated parts should so fall as to form *two* "*grounds.*" If both of the broken wires, not protected by the insulating covering, should touch the ground, the current would continue to flow. If *one* end should touch the ground, or, perhaps to speak more accurately in the language of this science, should touch *a* "*ground,*" that is, any conducting substance not itself insulated from the earth, the only consequence would be the cessation of the flow of the current from the dynamo. A man can safely take hold of one of these electric light wires, when the dynamo is in motion, at a point where the wire is broken, without receiving any shock or injury whatever, provided he is sure that there is nowhere in the circuit a second "ground;" and that for the simple reason that the current is not flowing in case of a break, unless the circuit is completed by the existence of *two grounds*. One of the defendant's witnesses, an electrician of reputation, actually performed this experiment with one of the defendant's wires, taking hold of it with his moist hand, and without any injurious consequences. The evidence further satisfies me that, in order for injurious consequences to happen to the plaintiff from the breaking of one of the defendant's wires above the plaintiff's wires, it would be necessary for both of the broken ends of the defendant's wire to be "grounded" in some way, and for one of them to be "grounded" upon a wire of the plaintiff; and that, in order to be grounded on a wire of the plaintiff, its insulating covering must be worn off or rendered defective by the presence of water. If the two broken ends of the same wire of the defendant were to rest upon the same wire of the plaintiff, and at the point of contact both were deprived of their insulation, the whole current could be transmitted to the plaintiff's wire. But it is obvious from the whole testimony,

*first*, that the danger of the defendant's wires breaking at all is very remote and improbable, and, *secondly*, that, in case one of them should break, the danger of such a contact with the plaintiff's wires, as would transmit their current to those wires, is extremely improbable. Injurious consequences from such an accident could hardly be anticipated under a reasonable inspection, especially in view of the uncontradicted testimony, that the defendant transmits electric currents over its wires only in the daytime. Undoubtedly, there is some danger. It would be unjust to the plaintiff to say that this action has been brought and prosecuted on grounds which are merely fanciful; but the danger may well be regarded as "doubtful, eventual or contingent," within the rule of the decisions above referred to.

But, even if the dangers which the plaintiff apprehends were probable, there is a general concurrence of expert testimony to the effect, that the injurious consequences apprehended from them might be prevented by slight expense on the part of the plaintiffs in inserting in each of its wires, at or near the point where it enters any of its buildings or offices, what is known as a *fusible plug*. This is a simple device, consisting of a section of leaden wire or strip of lead, inserted in the circuit, which melts when the current passing through the circuit reaches a certain intensity, breaking the circuit,—a result which would take place before the current would reach a sufficient intensity to burn a telegraphic instrument. The evidence shows that the cost of the fusible plugs would probably be four or five cents each, and that the cost of purchasing and inserting them in the fifty or more wires which pass over the plaintiff's poles on Locust street would not perhaps exceed $5 or $10. In actions at law for damages it is a maxim constantly applied, that the plaintiff cannot recover damages for an injury which might have been prevented by reasonable care on

his part, *after* receiving the hurt from the defendant. In other words, the plaintiff in such a case is under both a moral and a legal duty to use reasonable pains, care and skill to arrest or diminish the damages which may have been inflicted upon him by the wrong of the defendant, and he can only charge the defendant for such damages as have or would have accrued to him notwithstanding the exercise of such pains, care and skill. *Jenks v. Wilbraham*, 11 Gray, 143 ; *Bardwell v. Jamaica*, 15 Vt. 438. On like grounds, it is apprehended that a court of equity, which has been called "a court of conscience," will not go to the extreme of enjoining a party in the ordinary transaction of his lawful business, because of a possible injury which may result to the complainant, which injury the plaintiff may ward off at very slight pains and expense. The case of *Rosser v. Randolph*, 7 Port. 238 ; s. c., 31 Am. Dec. 712, is a distinct authority to the effect, that an injunction will not be granted in such a case. Such a case does not present that "strong and mischievous case of present necessity " ( *Attorney General v. Nichol*, 16 Ves. 338 ; *VanBergen v. VanBergen*, 3 Johns. Ch. 287), which is generally required to invoke this extraordinary aid of a court of equity. I cannot bring my mind to the conclusion, that the *dictum* quoted in the opinion of my associates from *Paddock v. Somes*, 14 S. W. Rep. 749, was intended to impugn this just and salutary principle.

*Thirdly*, the evidence is even weaker as to any probable danger from *induction*. The plaintiff, in addition to its telegraph line, operates in the city of St. Louis a number of telephone lines. The evidence ( including that adduced from the plaintiff ) is to the effect, that the inconvenience from induction is greater in the case of *telephone* than in the case of telegraph wires. But the evidence puts it beyond all doubt that no danger of this kind is to be apprehended, either to any telephone wires which the plaintiff may see fit to

string upon its poles on Locust street, or to any of its telegraph wires connecting with its most delicate instruments. The evidence shows that electric light wires of the character of the defendant's wires are strung in Kansas City for considerable distances on the same poles with telegraph wires, and not more than five feet apart, without any injurious consequences. It also shows that in the city of St. Louis electric light wires like those of the defendant are strung upon the same cross-arm with telephone wires, and but twelve or fourteen inches apart for considerable distances, without producing sufficient induction to substantially impair the use of the telephone wires. A faint murmur of the dynamo is heard in the telephone receiver, but this does not at all obstruct or prevent the hearing of the conversation. The evidence further shows that serious induction does not take place, even where electric light wires are near each other, unless they parallel each other, so to speak, for long distances. In short, the evidence satisfies me that, where the distance of paralleling is but one hundred and twenty-six feet, there is no danger to the plaintiff from induction whatever. Indeed, the evidence indicates that, while there may be and is danger from induction from one telegraph wire to another, there would be, even with close proximity, little danger of induction from an electric light wire to a telegraph wire. The reason is that inductive currents are very slight where the current flows steadily, whereas the condition under which they are most pronounced is that of the current being broken, which takes place constantly in telegraphy; in other words, in what is sometimes called a make-and-break current.

My original impressions upon this branch of the case have been confirmed by reading an opinion of Mr. District Judge ( now Mr. Justice ) BROWN, in the case of *Cumberland Tel., etc., Co. v. Railroad,* 42 Fed. Rep. 273, in which an attempt was made by a telephone

company to enjoin an electric railway company from using the earth for its return currents, the ground on which the plaintiff claimed relief being that it was using the ground for its return current, and that a use of the ground by the defendant was causing interference with the plaintiff's currents by induction, or, as it is sometimes called, "conduction." The telephone company, having been prior in time, claimed to be prior in right. But the court took the view that this claim was tantamount to a claim of a monopoly of the earth, and denied the injunction. For much stronger reasons, such relief should be denied here where no danger from atmospheric induction is to be apprehended, and where to grant relief would be to give the plaintiff in a sense a monopoly of the atmosphere.

I am, therefore, clear that the evidence affords no substantial ground for any relief by injunction against the defendant. I think that the judgment should be reversed, and the cause remanded to the circuit court with directions to enter judgment for the defendant.