## THE CHICAGO TELEPHONE COMPANY

*v.*

## THE NORTHWESTERN TELEPHONE COMPANY.

*Opinion filed October 25, 1902—Rehearing denied December 5, 1902.*

1. ORDINANCES—*statute does not specify what shall be entered on journal of common council.* Section 12 of article 3 of the City and Village act, requiring the common council to keep a journal of its own proceedings, does not specify what particular proceedings shall be entered upon the journal, so far as such proceedings relate to precedent action taken before the final passage of an ordinance.

2. SAME—*when ordinance will be presumed to have been read at presentation.* If the journal of a common council recites that a certain ordinance was presented and "laid over under the rules," it will be presumed it was read as well as presented, where one of the rules adopted by the council requires that all ordinances, "after being presented *and read,* shall lie over one week" before final action.

3. SAME—*effect where grantee of privilege is not fully organized when ordinance is presented.* An ordinance granting privileges to a corporation is not invalid because presented before the final certificate of incorporation is filed in the recorder's office, as required by law, if the corporation is fully organized at the time of the passage of the ordinance and its acceptance by the corporation.

4. SAME—*when validity of ordinance cannot be attacked.* If an ordinance granting a privilege to a corporation is accepted and acted upon it becomes a contract between the city and the corporation, and its validity cannot be attacked by third parties.

5. MUNICIPAL CORPORATIONS—*a city cannot grant exclusive privileges in streets.* A city holds title to its streets in trust for the benefit and use of the public, and it has no power to grant the exclusive use of its streets to one company alone, for telephone purposes.

6. TELEPHONE COMPANIES—*protection to which a telephone company is entitled as against new company.* While a telephone company which has been granted the privileges of the streets of a city is not entitled to such privileges exclusively, yet it is entitled, as against new telephone companies, to protection from such an interference as will prevent the practical operation of its lines.

7. SAME—*right of a new company to "parallel" and "overbuild" old company's lines.* An existing telephone company has no exclusive right to any street in a city nor to any particular side of such street, and hence a new company has the right to "parallel" and "overbuild" the old company's lines, provided it does so in such a manner as will not prevent the practical operation of the old company's lines.

8. INJUNCTION—*equity will not ordinarily interfere with city's control of its streets.* A court of equity will not interfere with a city's control over the use of its streets unless the power is abused by the city to the oppression of persons or corporations having rights in the street, or unless the action of the city in such respect is fraudulent or grossly wrong and unjust.

9. SAME—*injunction will not issue to allay mere apprehensions.* An injunction will not be granted to allay the fears and apprehensions of parties, but only to grant protection against acts which are not only threatened but will in all probability be committed to the injury of the complainant.

*Chicago Tel. Co. v. Northwestern Tel. Co.* 100 Ill. App. 57, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Kane county; the Hon. G. W. BROWN, Judge, presiding.

This is a bill, filed in the circuit court of Kane county on July 31, 1900, by the appellant, the Chicago Telephone Company, against the appellee, the Northwestern Telephone Company, for the purpose of enjoining appellee from interfering with the poles, wires and telephone system of the appellant, as existing in the streets of the city of Aurora. When the bill was filed, a temporary writ of injunction was issued in accordance with its prayer. An answer was filed by appellee, denying the alleged interference charged against it, and claiming the right, under an ordinance of said city, to itself construct a system of telephone poles and wires in the streets of Aurora. A replication was filed to the answer. On September 5, 1900, a motion was made to dissolve the injunction, upon which affidavits of the respective parties were heard; but the court overruled the motion to dissolve the injunction, and modified the injunction, so as to permit appellee to proceed with the construction of its telephone system in Aurora in such manner as not to interfere with the practical operation of the telephone system of appellant in said city. The cause was referred to the master

to report the evidence, but not his conclusions, and, by stipulation, the testimony, taken by one James Shaw, the official reporter, was used upon the hearing of the cause.   On August 2, 1901, after hearing and argument, the circuit court found the equities of the case to be with appellee, and dismissed the bill for want of equity, and dissolved the injunction.   An appeal from such decree of dismissal was taken to the Appellate Court; but a motion by the appellant to continue the injunction in full force pending the appeal was overruled by the circuit court.   The Appellate Court has affirmed the decree of the circuit court, and allowed an appeal to this court, and also entered an order continuing the injunction pending the appeal.   The case now comes before this court upon appeal from the judgment of affirmance, so entered by the Appellate Court.

The bill of the appellant, filed in the circuit court, alleges that, under an ordinance of the city of Aurora passed on September 6, 1881, appellant has the right to erect, maintain and use a system of poles and wires in the streets, alleys, avenues and public places of Aurora for the purpose of operating a telephone exchange in said city.   The bill refers to, and makes as an exhibit thereto, the ordinance in question.   The appellant in its bill further alleges, that it accepted the terms of said ordinance, and complied therewith, and has established in said city an exchange with telephones, and necessary equipment, and poles and wires on the streets, alleys and public places of the city, and expended therefor many thousands of dollars, and has kept up and maintained the same, and served the public for upwards of eighteen years, and has a system of eight hundred telephones, etc.; that it has placed poles at certain distances along the principal business and residence streets of the city, and provided the same with cross-arms to accommodate its wires thereon; that, on some of the business streets, it has leads of wires, running to its center or exchange

office, of over one hundred wires, aside from cables; that Aurora is a municipality of about 25,000 inhabitants, and that there is in operation therein a street railway, propelled by the overhead trolley system, employing overhead trolley wires charged with a high voltage current of electricity; that there are several electric lighting systems in the city, one operated by the city and maintained by a system of overhead wires along the principal streets, and one or more private lighting companies, using poles and overhead wires for the purpose of providing electricity for lights along the streets; that the said companies use a high voltage current, which, if it should come in contact with the appellant's wires, would burn out and destroy the switch-boards at the central exchange station, and would endanger by fire the residences and offices of its patrons, and the lives of its workmen, employed in maintaining its lines and keeping the same in repair; that such ordinance, having been accepted and acted upon by appellant, is a binding contract between it and the city.

The bill further alleges that appellee is, without warrant or authority of law, digging and tearing up the streets, and placing poles, wires, cross-arms, etc., in the streets in such manner, as to permanently endanger the property of appellant, and interfere with the successful operation of its system of telephones, and endanger the houses and offices of the citizens of the city; that appellee has in many instances, on the streets and alleys, unlawfully and unnecessarily paralleled appellant's system of wires on the same side of the street, and has placed huge, unsafe poles therein up through leads of many wires of appellant, and will, unless restrained, string wires thereon and overbuild the lines of appellant, not only with paralleling lines, but crossing its lines at various angles, and crossing over the lines of the street railway trolley system and the electric lighting systems; that, in case of any accidental dropping of wires across

the lines of appellant, and across the lines of the other companies above named carrying a high voltage current of electricity, such high voltage current will be transferred to the lines of appellant, thus endangering the property and lives in question; that such overbuilding and crossing of appellant's lines by the appellee endangers the existence of appellant's system; that thereby damage will be caused, which will be irreparable in its nature; that, in case of storms or violent winds, the swaying of poles and sagging of wires will cause the crossing of appellant's wires with each other, thus putting telephones out of service, etc. ·

The bill further alleges that the appellee claims the right to thus interfere under an ordinance, presented by it to the city council of Aurora on July 17, 1899, and entitled "An ordinance granting to the Northwestern Telephone Company certain rights in the city of Aurora;" but that said ordinance is void, and conveys no authority to appellee to tear up and obstruct the streets; that, when said ordinance of appellee was presented to the city council, appellee was not an organized corporation and had no legal existence; that, when said ordinance was presented to the council on July 17, 1899, it was not read, as required by the city rules and ordinances, and for that reason is void; that appellee did not present such bond to the city council as was required by the ordinance, even if it was legally passed.   The bill further alleges that "it was and is the duty of said Northwestern Telephone Company to so construct its lines, as not to unnecessarily interfere with the system and lines of your orator; that it was and is the duty of said defendant company in the construction of its lines, in cases where it is absolutely necessary to cross or parallel the lines of your orator, to underbuild the lines of your orator."

The bill prays that an injunction may be issued, restraining appellee from in any manner interfering with the poles, wires and telephone system of appellant, and

from overbuilding same, and from paralleling its lines on the same side of the street with wires placed on poles above the wires of appellant, and from placing poles on the same side of the street with the poles of appellant, and from placing distributing wires or other wires thereon above the wires of appellant, either paralleling or crossing the same, and from obstructing the streets, avenues and alleys of the city of Aurora with poles, wires and equipments. The bill further prays that the ordinance of 1899 above referred to be declared to be null and void, and that appellee be required to remove the poles, wires and equipments, already erected and placed by it in said streets, avenues and alleys.

Appellee in its answer admits, that appellant had the right, under the ordinance of September 6, 1881, to erect, maintain and use a system of poles and wires in the streets, alleys, avenues and public places of the city of Aurora for the purpose of operating a telephone exchange, and thereunder had rights vested in it, but no other rights and privileges than those defined by said ordinance. The answer also admits, that appellant has constructed its telephone system in the streets and operated the same as alleged, but denies that appellant possesses or enjoys the exclusive right of using the streets, alleys and public places in said city for said purposes, but enjoys said rights and privileges in common with all other telephone exchanges duly authorized by the city to do business in said city. The answer also sets up that, by an ordinance passed on August 7, 1899, appellee and its successors and assigns were granted by the city of Aurora the permission and authority "to construct, operate, maintain and repair in the streets, avenues and alleys of the city of Aurora for and during a period of twenty years from and after the date of the passage thereof, lines of poles, wires, cables, underground conduits, or other electrical conductors, to be used for the transmission of sound, signals and intelligence by means

of electricity or otherwise," and to be used in the opera-
tion of a telephone exchange; and the answer sets up, as
an exhibit thereto, a duly certified copy of said ordinance
of August 7, 1899. The answer further avers that, under
the two ordinances above named, appellant and appellee
have the same and equal rights to use and occupy the
streets, alleys, avenues and public places in said city for
the placing of their poles and wires, and that neither has
a superior right to that of the other; that both appellant
and appellee enjoy said rights and privileges to place
said poles and wires in any manner above prescribed,
which does not unnecessarily or unreasonably interfere
with any other poles or wires placed in said streets, al-
leys, avenues and public places, and that appellant, be-
cause of having a franchise granted at an earlier date,
does not acquire any rights superior to those enjoyed
by appellee; that the Chicago Telephone Company, the
Northwestern Telephone Company, the Western Union
Telegraph Company, the Postal Telegraph Company, the
Aurora Electric Light and Power Company, and the
Aurora Street Railway Company have constructed lines
and poles and wires in said streets and alleys, and are
now operating the same for the purpose of conveying
electricity; and that the city of Aurora has lines of poles
and wires on said streets and alleys for its police alarm
system, and for its fire alarm system, and also lines of
poles and wires for furnishing electric light, there being
thus nine distinct systems of poles and wires extending
through said streets and alleys for the purpose of con-
ducting electricity; that three of said systems, to-wit,
those used by the Aurora Electric Light and Power Com-
pany, the Aurora Street Railway, and said Aurora City
Lights, conduct high voltage currents of electricity.

The answer further avers that, in many of its streets,
appellant has unnecessarily placed a line of its poles
and wires on each side of the street, where one line on a
single side would have been amply sufficient, had it been

properly constructed; that, in some instances, it has placed as high as fourteen cross-arms on a single pole, with ten wires on each cross-arm, making a total of one hundred and forty wires on each pole, and that, in many of the streets, it has upwards of ten cross-arms with ten wires on each cross-arm on a single pole, while appellee has never placed to exceed three cross-arms on any one pole, with a total of ten wires on each cross-arm, and a total of not to exceed thirty wires on any single pole; that, where it has been necessary to use more than thirty wires along a certain line of poles, appellee has always used an overhead insulated cable, which protects the wires from any contact with other and different electric wires; that the greatest part of the danger, real and imaginary, set forth in the appellant's bill, arises from the negligent construction of its own system of poles and wires; that there is a certain degree of danger to persons and property from the construction of many and different lines of poles and wires along the streets, etc., when a part of the wires convey high voltage currents of electricity; that the city, in order to reduce the danger to a minimum, on February 4, 1884, passed a general ordinance, defining the duties of all persons and companies constructing and maintaining lines of poles and wires, which ordinance is set forth as an exhibit to the answer; that, along many of the streets in Aurora, there are as high as four or five lines of wires, belonging to different companies and used for different purposes, on each side of the street; that it thereby becomes necessary that companies, in constructing lines of wires, shall both overbuild and underbuild other lines of wires already constructed, not only of low but of high voltage; that, in the matter of the crossing different streets, alleys and public places, the different lines of wires must necessarily be extended both above and below other lines of wires both of high and low voltage; that this is a condition of affairs that does not exist solely between appellant and appel-

lee, but in relation to all the different companies operating different systems of poles and wires; that, to reduce the danger resulting from the crossing of the wires, the city of Aurora has by ordinance placed the supervision and direction of all said lines of poles and wires in the committee on streets and alleys of the city; that, ever since the passage of the ordinance of February 4, 1884, the supervision and direction of the construction and maintenance of said lines of wires has remained with said committee on streets and alleys; that the courts have no authority to review the action of the city council in said matter in the absence of gross fraud or willful and wanton negligence on the part of the said committee; that said committee has always faithfully performed the duties imposed upon it; that, under its ordinance of August 7, 1899, it was the duty of appellee to obtain a permit in writing from the committee on streets and alleys, before opening any street or alley for the purpose of laying conduits or erecting poles or placing wires on the same; that appellee obtained such a permit in writing from the committee on streets and alleys; that appellee, under said ordinances of February 4, 1884, and August 7, 1899, and said permit in writing, had no discretion in constructing its telephone exchange and placing its poles and wires, but was compelled to go upon the streets, and on the particular sides of the streets, mentioned in said permit; that, in constructing its lines and poles and wires, appellee has at all times been under the supervision and direction of said committee; that, by said ordinance of February 4, 1884, it is provided that "the wires of said lines shall be placed on straight poles not less than thirty feet in height above the ground;" that a majority of all the poles of appellant in said city are but thirty feet in height above the ground; that thereby appellee was compelled to overbuild appellant's lines, wherever appellant's lines were placed upon the same side of the street, upon which appellee constructed its

lines; that, where appellee's lines of poles and wires crossed the streets upon which appellant's lines of poles and wires were erected, it was necessary for appellee to either overbuild or underbuild said lines, and, because of the short length of most of appellant's poles, it was necessary for appellee to overbuild appellant's lines; that the same condition of affairs, in the matter of overbuilding and underbuilding appellant's lines of wires, exists in relation to the other companies and persons having wires in the streets as above named; that, as a rule, the wires conducting electricity of high voltage, namely, the wires of the Aurora Street Railway, the Aurora Electric Light and Power Company, and the Aurora Electric Lights, are constructed beneath the wires conducting electricity of low voltage, namely, the wires of appellant, the Western Union Telegraph Company, the Postal Telegraph Company and the police and fire alarms of the city; that the dangers, spoken of in the bill arising from the construction of appellee's poles and wires, are exactly the same, so far as appellant is concerned, as those which exist because of the construction and operation of any of the other lines of wires above specified; that there is not as much danger to appellant's wires, because of contact with any wire of appellee which might break and cross some wire conducting electricity of high voltage, because appellee's wires, wherever they cross any wires of high voltage, are insulated in the latest and most approved manner, and, because of such insulation, it is impossible that electricity should be conducted by such broken wire of appellee, if any existed, from a wire conducting electricity of high voltage to appellant's wires; that the dangers, because of the fact stated, as described in the bill, do not exist; but that, if they do exist, they are such dangers, as are necessarily connected with the construction and maintenance of different lines of wires along the same side of the same street, a part of the wires conducting electricity of high voltage; that such danger

that exists is not peculiar to any particular construction of appellee's poles and wires, but exists in connection with the possible contact of any of the different wires specified; that the dangers, specified in the bill, are not real, and do not exist, but are only imaginary for the further reason that, if any of appellee's wires did in fact break and cross any wire conducting electricity of high voltage, and the insulation of appellee's wires should prove insufficient, which is highly improbable, appellant would not be injured, unless the same identical wire should also break in some other place and form a contact with appellant's wires; that, while this condition is possible, it is in no way likely to happen, and the dangers from this source are infinitesimal, compared with the dangers, which appellant undergoes from the breaking of its own wires, and the forming of a direct contact between its own wires and the wires, conveying electricity of high voltage in said city; that, where the wires of appellee cross wires conveying electricity of high voltage, appellee has used only insulated wires of the most modern and approved character, while in numerous cases the bare uninsulated wires of appellant are constantly crossing both over and below the bare uninsulated and unprotected wires, conveying electricity of high voltage; that the manner, in which appellant is conducting its system of wires, is negligent and careless almost to the extent of willful and wanton negligence, and of willful and wanton disregard of life and property; that such dangers are imaginary for the further reason that appellee, in constructing its telephone exchange in accordance with modern and approved methods protects every building where its wires go, and every switch-board, and every telephone, with the latest constructed and modern fuses, which do not allow electricity of high voltage. to enter any building, switch-board or telephone; that, where appellant does not use the same means of protection by fuses, any dangers, resulting to it because of the contact

of its wires with other wires conveying electricity of high voltage, are dangers caused by its own defectively constructed and operated system of telephones, and appellee is not responsible therefor; that the injuries and damage, referred to in the bill, are such as are necessarily connected with, and incident to, the construction and operation of different lines of electric wires along the streets of a city, and are common and incident to every corporation and city having wires extending along the streets in connection with other wires; that such dangers are not peculiar to the relations existing between appellant and appellee; that the permit from the street and alley committee of the city to appellee to construct its lines of poles and wires was granted May 7, 1900; that, since then, appellee has kept at work a force of men upon said streets and alleys, and has expended in the construction of its poles and wires and its underground cable, more than $100,000.00, all of which has been well known to appellant; that appellant, in permitting such expenditure and work, has been guilty of *laches*, and is estopped from objecting to the manner in which appellee has constructed its work.

The answer denies that appellee was not a duly organized corporation when the ordinance of August 7, 1899, was passed, and alleges that said ordinance was a legal and valid ordinance, and passed in a legal and valid way. The answer also avers, that the bond, given by appellee, was given within the time required, and was approved by the city. The answer further alleges that all the matters set up in the bill in regard to the corporate existence of appellee, and the validity of the ordinance under which it acts, and its right thereunder to construct telephone exchanges, are matters that can be attacked and assailed only in a direct proceeding for that purpose, and cannot be attacked and assailed collaterally in this proceeding.

ALBERT J. HOPKINS, FRED A. DOLPH, and ROBERT BRUCE SCOTT, (HOLT, WHEELER & SIDLEY, of counsel,) for appellant:

A corporation occupying a portion of the street with its equipment, under an ordinance, has a right of occupancy which is a property right, that will be as much protected from unlawful invasion as any other property. *Chicago* v. *Baer*, 41 Ill. 306; *Parmelee* v. *Chicago*, 60 id. 267; *Railway Co.* v. *Chicago*, 90 id. 573; *Rich* v. *Chicago*, 152 id. 18; *Railway Co.* v. *Chicago*, 178 id. 339; *Railway Co.* v. *Chicago*, 183 id. 75.

Appellant having accepted the terms and acted under the provisions of an ordinance with the city of Aurora for eighteen years, which specifically provided that any subsequent grant to any other company should not interfere with the rights granted to appellant, that ordinance amounted to a contract, which could not be violated. *Belleville* v. *Railway Co.* 152 Ill. 171; *Harvey* v. *Railway Co.* 186 id. 293.

Priority in time gives appellant priority in right, and appellee's grants, even if valid, are subject to and subordinate to appellant's grant. *Railway Co.* v. *Railway Co.* 5 Am. Elec. Cas. 362; *Rutland* v. *Marble City Co.* 65 Vt. 377; *Electric Light Co.* v. *Electric Co.* 94 Ala. 372; Joyce on Electric Law, secs. 945, 515.

A provision that an ordinance shall be presented and read at least one week before its final passage is mandatory, and an ordinance which is not read at a meeting at least one week before its final passage is void.   Dillon on Mun. Corp. sec. 309; *Swindell* v. *State*, 42 N. E. Rep. 528; *Mason* v. *Shawneetown*, 77 Ill. 533.

An ordinance granting rights to a corporation is like a contract or deed.   There must be a grantor, a grantee and a thing granted, and if any of these three essentials is lacking it is void.   In this case there was no grantee. *Harriman* v. *Southam*, 16 Ind. 190; *Provost* v. *Morgan*, 42 La. Ann. 809; *Douthit* v. *Stinson*, 63 Mo. 268.

MURPHY, ALSCHULER & NEWHALL, (MEZZANI SLUS-
SER, and SAMUEL ALSCHULER, of counsel,) for appellee:

The City and Village act does not require that the
journal of the council shall show affirmatively that an
ordinance was passed in accordance with the rules of pro-
cedure adopted by such municipality, and in the absence
of such a statutory requirement the legal presumption is
that such ordinance was passed in accordance with the
rules, unless the contrary is shown by the journal of the
city council proceedings. *Supervisors* v. *People*, 25 Ill. 181;
*Railroad Co.* v. *Hughes & Selz*, 38 id. 175.

A journal of the proceedings of the city council which
shows that an ordinance was presented and on motion
"was laid over under the rules," is a sufficient showing
that such ordinance was read in accordance with the
rules. *Barr* v. *Auburn*, 89 Ill. 361; *Gilbert* v. *Rabe*, 49 Ill.
App. 418; *Belknap* v. *Miller*, 52 id. 617.

An ordinance granting a franchise to a private cor-
poration to construct an improvement in the streets of
a city is a mere license, revocable at the pleasure of the
city, until accepted or acted upon.  But when accepted
by such private corporation or acted upon by the con-
struction of such improvement, it then becomes a valid
and binding contract between such city and private cor-
poration, and cannot be revoked by either party with-
out the consent of the other.  The city and such private
corporation may waive or vary any of the terms or condi-
tions of such contract.  A competing corporation, a citi-
zen, a tax-payer or an abutting property owner, not being
a party to such contract, cannot take advantage of the
non-performance of any of the terms or conditions of
such contract.  *Quincy* v. *Bull*, 106 Ill. 337; *People* v. *Tele-
phone Co.* 192 id. 307; *Belleville* v. *Railway Co.* 152 id. 171;
*Rapid Transit Co.* v. *Trust Co.* 90 Ill. App. 460; *Chicago Tel.
Co.* v. *Northwestern Tel. Co.* 100 id. 57.

If an ordinance is passed granting a franchise to a
corporation not yet fully organized, such franchise is a

199—22

mere license; but when such corporation becomes fully organized and accepts such franchise and constructs a public improvement under the same, the franchise then becomes a valid and binding contract, to the same extent that it would have been had the corporation been fully organized at the time of the passage of said ordinance. *Chicago Tel. Co.* v. *Northwestern Tel. Co.* 100 Ill. App. 57; *Lauder* v. *Trotting Society,* 71 id. 475; *Bank* v. *Lumber Co.* 32 W. Va. 357; *Electric Light Co.* v. *Clarksburg,* 47 id. 739; *People* v. *Telephone Co.* 192 Ill. 307; *Hotel Co.* v. *Military Encampment Co.* 140 id. 248; *Paper Co.* v. *Rose,* 37 L. R. A. 162; *Whitney* v. *Wynn,* 11 Otto, 417; *Wharf Co.* v. *Judd,* 108 Mass. 224.

If a private corporation has authority from the city to place an obstruction, in the form of a public improvement, in the streets of a city, a competitor, a citizen, an abutting property owner or a tax-payer cannot enjoin such obstruction of the street unless he sustains thereby special and irreparable damage and injury, different in kind and character from that sustained by the public and other property owners. In such case the special and irreparable damage, different in kind from that sustained by the public, is the gist of the right to an injunction, and must be clearly alleged and clearly proven. *Stewart* v. *Railway Co.* 58 Ill. App. 446; *Kerfoot* v. *People,* 51 id. 409; *Chicago* v. *Building Ass.* 102 Ill. 379; *Doane* v. *Railway Co.* 165 id. 510; *Patterson* v. *Railroad Co.* 75 id. 588; *Corcoran* v. *Railroad Co.* 149 id. 291; *Stetson* v. *Railroad Co.* 75 id. 74.

A city has no power or authority to grant the exclusive use of the streets to any private person or for any private purposes, but must hold and control the possession exclusively for the public and for its use. *Pennsylvania Co.* v. *Chicago,* 181 Ill. 289.

A court of chancery will not assume jurisdiction to control the use of a street in an incorporated city or the manner in which the same is occupied by various private corporations, for the reason that this power is conferred by law upon the corporate authorities of the city, and a

court of equity has no jurisdiction to interfere unless the exercise of such power is being manifestly abused, to the oppression of such corporations. *Mt. Carmel* v. *Shaw*, 155 Ill. 37; *Telegraph Co.* v. *Guernsey*, 46 Mo. App. 120; *Bush* v. *Carbondale*, 78 Ill. 74; *Canal Comrs.* v. *East Peoria*, 179 id. 214; *Gas Light Co.* v. *Lake*, 130 id. 42; *Barrows* v. *Sycamore*, 150 id. 589; *Patterson* v. *Railway Co.* 75 id. 589.

In the case of the construction of overhead poles and wires, a court will not grant an injunction except to prevent irreparable injury, and it must first be established by a preponderance of the evidence that the injury will be likely to occur before the injunction is granted. · The mere possibility, or anything short of a reasonable probability, of injury is insufficient to warrant an injunction against any proposed use of property by its owner. *Telephone Co.* v. *Railway Co.* 3 Am. Elec. Cas. 350; *Lorenz* v. *Waldron*, 96 Cal. 243; 16 Am. & Eng. Ency. of Law, 360, 361.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The first point made by appellant is, that the ordinance of August 7, 1899, under which appellee proceeded to construct its telephone system in the streets of Aurora, is a void ordinance, and that, for that reason, appellee in such construction proceeded without lawful authority, and is a mere trespasser.

The first ground, upon which it is claimed that the ordinance of August 7, 1899, is void, is that it was not read at the time of its presentation to the common council of the city of Aurora on July 17, 1899. When it was presented to the common council, there was in force an ordinance of the city of Aurora, which provided as follows: "All ordinances, alterations of grades, plats of surveys, resolutions affecting streets and alleys, after being presented and read, shall lie over one week before final action shall be taken thereon." Appellant introduced in evidence a certified copy of the minutes of the

proceedings of the city council of Aurora, which show that, on July 17, 1899, "Alderman Linden presented an ordinance, granting a franchise to the Northwestern Telephone Company in the city of Aurora, which, on his motion, was laid over under the rules." The minutes of the council proceedings further show that, subsequently at a meeting held on August 7, 1899, some three weeks after the ordinance was so presented, it was read upon its final passage, and considered section by section; and each section was read and passed as read, some of the sections being amended; and that, thereupon upon motion that the ordinance as amended be passed as read, the motion was carried by the votes of all the aldermen present. In other words, on August 7, 1899, the ordinance was unanimously adopted. The bill avers that the city of Aurora contains a population of 25,000. Section 2 of article 3 of the City and Village act, which is the charter of the city of Aurora, provides that the number of aldermen shall be fourteen where the number of inhabitants exceeds 10,000, and does not exceed 30,000. When this ordinance was passed, thirteen aldermen were present, and all voted in favor of its passage. Inasmuch as the record of the council proceedings on August 7, 1899, shows that only one of the fourteen aldermen was absent, the showing of the journal was sufficient in regard to the proper passage of the ordinance. (*Barr* v. *Village of Auburn*, 89 Ill. 361).

The theory of appellant is that, because of the supposed silence of the journal of the council proceedings on July 17, 1899, as to the reading of the ordinance when it was presented, the failure to read it at that time is established. It is not clear, however, that the record of the council proceedings fails to show a reading of the ordinance on July 17, 1899. It is true that, by the terms of section 7 of article 3 of the City and Village act, the city council "shall determine its own rules of proceeding." It is also true that, by the terms of section 12 of

said article 3, the council "shall keep a journal of its own proceedings." Counsel for appellant insist, that the city council of Aurora, in adopting the ordinance, which requires that all ordinances, after being presented and read, shall lie over one week before final action shall be taken thereon, determined thereby for itself a rule of proceeding in the matter of adopting ordinances; and that, where the mode of enacting ordinances is prescribed, it must be followed. It is said that, inasmuch as one of the rules adopted by the city council of Aurora prescribed that an ordinance should be presented and read, and then should lie over one week, the journal of its proceedings must show, not only that it was so presented, but also that it was read. There is nothing, however, in the ordinances or rules of proceeding, adopted by the city council of Aurora, which requires that the record of the proceedings shall show both a presentation and reading of the ordinance, before it lies over for a week for final action. But the record of the proceedings may show by implication that there was a reading, as well as a presentation of the ordinance, though there may be no express showing upon the record that the ordinance was read. Here, the record recites that one of the aldermen presented the ordinance, "which, on his motion, was laid over under the rules." The rule, under which it was laid over, recited that it should so lie over after being presented and read. The clear inference, therefore, is that, if it was laid over under the rules, it was not only presented, but also was read. It could not have been laid over under the rules, unless the rule upon the subject was complied with. In view of the recital thus made in the record of the proceedings, it will be presumed that the ordinance was read when it was presented, inasmuch as it was laid over under the rules.

Article 3 of the City and Village act does not specify what particular proceedings of the common council shall be entered upon its records, so far as those proceedings

relate to precedent action taken before the final passage
of an ordinance. Section 13 of article 3 provides that the
yeas and nays shall be taken upon the passage of all or-
dinances, etc., "which shall be entered on the journal of
its proceedings." When the ordinance of August 7, 1899,
was finally passed on that day, the thirteen yeas, voted
in favor of its passage, were entered upon the record, as
required by section 13. This court has decided in a num-
ber of cases that everything, which the constitution of
the State has required to be entered upon the journals
in the progress of a bill through the two houses of the
legislature, is essential to its binding force, and must ap-
pear from the journals to have been performed. Where
an act of the legislature has received the signatures of
the speakers of both houses, and the approval of the
Governor, such verification is *prima facie* evidence of its
validity as a legislative enactment, but the journals of
either branch of the legislature may be resorted to for
the purpose of overcoming such *prima facie* evidence of
its validity; and it may be shown from the journals, that
an act was not passed in the mode prescribed by the con-
stitution; and, where the journal is silent as to whether
any requirement of the constitution in the passage of a
bill has been complied with, the silence of the journal
is accepted as evidence of such non-compliance. (*People
ex rel.* v. *Starne,* 35 Ill. 140; *Illinois Central Railroad Co.* v.
*People,* 143 id. 434). But where the constitution does not
require a fact to be recorded upon the journal, and it can
be inferred from the recital in the journal that such fact
existed, or such step was taken, then the presumption
will be indulged that such fact did exist, or such step
was taken, in order to sustain the validity of the law,
where the contrary does not appear from the journal
itself. (*Wabash Railway Co.* v. *Hughes & Selz,* 38 Ill. 174).
So, here, inasmuch as the record recites that the ordi-
nance was laid over under the rules, and inasmuch as
the rules require that it shall be presented and read

before it lies over for one week, the presumption will be indulged that the rule was complied with, not only in regard to the presentation of the ordinance, but also in regard to the reading of it. The reading of the ordinance is involved in a proper presentation of it to the council. The object of the requirement, that all ordinances, after being presented and read, shall lie over one week before final action shall be taken thereon, is that the members of the common council, by reading the ordinance or hearing it read, may be fully informed as to its contents. The ordinance was presented to the common council on the 17th day of July, 1899, and laid over for three weeks before its final passage. There was abundant opportunity during this period for any alderman, who cared to do so, to examine the ordinance, and become familiar with its provisions. When it came up for final passage, it was read section by section, and, inasmuch as amendments were adopted upon motions made, it must have been discussed and carefully considered. In view of its passage by a unanimous vote, it cannot be said that it is invalid by virtue of the alleged silence of the record of the council proceedings as to the reading of it when it was first presented. We are, therefore, of the opinion that the ordinance is not void for the first reason thus urged against its validity by the appellant.

The second ground, upon which it is alleged that the ordinance of August 7, 1899, is void, is that, when it was introduced into, or presented to, the city council of Aurora on July 17, 1899, appellee had no legal existence as a corporation.

On July 6, 1899, the statement for the incorporation of appellee was executed. On July 7, 1899, it was filed in the office of the Secretary of State. On July 22, 1899, the commissioners, who had opened books for subscription to the capital stock of appellee, reported to the Secretary of State that the stock had all been subscribed; and the Secretary on that date issued a certificate of

organization. On July 24, 1899, this certificate was filed in the office of the recorder of Will county—the county, in which the principal office of the appellee is located. It thus appears that the ordinance, granting to the appellee its privileges, and finally passed on August 7, 1899, was presented to the common council of Aurora seven days before the certificate of appellee's organization was filed in the recorder's office, as required by the Corporation act. Section 4 of chapter 32 of the Revised Statutes of Illinois in regard to corporations provides that, "upon the recording of the said copy, the corporation shall be deemed fully organized, and may proceed to business."

Although the certificate of complete organization was not filed in the recorder's office until July 24, seven days after July 17, 1899, when the ordinance was presented to the common council of Aurora, yet the ordinance was so presented to the city council of Aurora after appellee had been licensed by the Secretary of State to incorporate. We do not think that the appellee's charter is null and void for the reason thus insisted upon.

In support of its contention upon this branch of the case appellant refers to cases decided by this court, which hold that a corporation should have a full and complete organization and existence as an entity, before it can enter into any kind of a contract, or transact any business; and that a corporation, assuming to be created under the Incorporation act of this State, can have no right to transact business, when the certificate of its complete organization has not been filed for record in the recorder's office, as directed by the statute. (*Gent* v. *Manufacturers' and Merchants' Mutual Ins. Co.* 107 Ill. 652; *Loverin* v. *McLaughlin,* 161 id. 417). The cases, thus referred to, do not sustain the contention that the ordinance of August 7, 1899, was void, because it was introduced into the common council before the complete organization of appellee under the statute. A privilege, granted by a city to construct a public improvement in the streets, is

a mere license to the corporation, until the corporation accepts the grant, and constructs the public improvement thereunder in accordance with the terms and conditions of the same. When the grant is accepted by the corporation, after the passage of a legal ordinance granting it, and in pursuance of the terms of such ordinance, then there is a contract between the city and such corporation. Here, the introduction of the ordinance in the common council was merely in the nature of an offer or proposition, and did not become a contract, until the ordinance was subsequently passed and accepted. No action was taken by the city in reference to the ordinance when it was first introduced, but it was laid over under the rules until the next meeting. Before August 7, 1899, the city had not bound itself by any contract to the appellee. The ordinance was, from July 17, 1899, until its passage on August 7, 1899, merely under consideration by the city council. In the meantime on July 24, 1899, two weeks before the ordinance was finally passed, appellee became fully and completely organized by receiving its certificate of complete organization from the Secretary of State, and filing the same with the recorder of deeds of Will county, where its principal office was situated. It was not until after the appellee was thus completely organized, that the matter came before the city council for its final action, and then the city council by unanimous vote passed the ordinance making the grant to appellee. The city suffered no harm or injury from the fact that appellee was not completely organized when the ordinance was originally presented to the council. It is sufficient that appellee was fully organized, and had a right in law to transact business, at the time of the passage of the ordinance and of its acceptance. The case of *Clarksburg Electric Light Co.* v. *City of Clarksburg*, 47 W. Va. 739, is a case in point upon this subject. In the latter case, it was held by the Supreme Court of West Virginia, that the grant by a city or town to an intended

corporation of a privilege to use its streets for the conveyance of electricity for public use in the town or city is valid, though at its date the corporation is not chartered, but is later chartered and accepts the grant. The West Virginia case is stronger than the case at bar for the reason that, there, the application for incorporation was made before the passage of the ordinance making the grant, but the incorporation was not completed until after the actual passage of the ordinance making the grant.

Counsel for appellant rely upon the case of *Stevens* v. *Merchantville*, 62 N. J. L. 167. In the New Jersey case, however, it is to be observed that the ordinance had passed the first and second reading before any steps had been taken towards the organization of the corporation. No steps were taken for the organization there, until the day before the ordinance came up for final passage on the third reading. In the case at bar, the application had been made to the Secretary of State for license to incorporate, and the parties had received license from that official, before the ordinance was introduced into the city council. Again, the New Jersey case arose in a direct proceeding brought to test the validity of the ordinance there under consideration. (See also *Richelieu Hotel Co.* v. *Military Encampment Co.* 140 Ill. 248; *People* v. *Central Union Telephone Co.* 192 id. 307; *Spring Garden Bank* v. *Hulings Lumber Co.* 32 W. Va. 357; *Rotch's Wharf Co.* v. *Judd*, 108 Mass. 224). We are of the opinion, that the ordinance of August 7, 1899, is not invalid for the second reason insisted upon by the appellant.

It is doubtful, however, whether the question as to the validity of this ordinance can be raised in this proceeding. It is a familiar principle of law, that the validity of a franchise or charter cannot be questioned or tested in a collateral proceeding, but only in a direct proceeding, instituted by the city or the people through the proper person or official. (*Thompson* v. *Candor*, 60 Ill.

244; *Bushnell* v. *Consolidated Ice Machine Co.* 138 id. 67; *Lees* v. *Drainage Comrs.* 125 id. 47). The ordinance, making the grant to appellee, having been accepted and acted upon by appellee, has become a contract between itself and the city; and appellant, not being a party to that contract, has no right to question its validity. (*City of Quincy* v. *Bull*, 106 Ill. 337; *People* v. *Central Union Telephone Co. supra; City of Belleville* v. *Citizens' Horse Railway Co.* 152 Ill. 171; *Chicago General Railway Co.* v. *Chicago City Railway Co.* 186 id. 219; *Chicago City Railway Co.* v. *People*, 73 id. 541; *Chicago Municipal Gas Light Co.* v. *Town of Lake*, 130 id. 42). It is also to be observed, that an obstruction in the nature of a public improvement, placed in the streets of a city by the permission of the city either express or implied, is strictly a matter between the city and the private corporation constructing the improvement, so that any action to test the right to so obstruct the street should be brought by the city, or by some public officer on behalf of the city. (*Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510; *Chicago General Railway Co.* v. *Chicago, Burlington and Quincy Railroad Co.* 181 id. 605; *Pennsylvania Co.* v. *City of Chicago*, 181 id. 289; *General Electric Railway Co.* v. *Chicago and Western Indiana Railroad Co.* 184 id. 588; *People ex rel.* v. *General Electric Railway Co.* 172 id. 129).

*Second*—The second question, presented by the record in this case, is mainly a question of fact; and that is, whether appellee has been guilty of such an interference with the rights of appellant, as to justify the issuance of the injunction prayed for in the bill. After a careful examination of the record, we are satisfied that the material averments of the answer, filed by appellee in the court below, are sustained by the proofs.

Section 3 of the ordinance of September 6, 1881, relied upon by the appellant in its bill, provides as follows: "The said common council expressly reserves the power to grant the right of way through, in and upon said streets, alleys and public grounds for the erection, main-

tenance and use of the necessary poles and posts and wires of any other telephone company or individuals whenever requested, so as not to interfere with the right hereby granted to the Chicago Telephone Company, its successors and assigns." It thus appears that, in the ordinance by the terms of which the city of Aurora granted to the appellant the right to establish its telephone system in the streets of that city, the city expressly reserves the power to grant the right of way through the streets for the erection and use of the necessary poles and wires of another telephone company than appellant. If there had been no such provision in the ordinance of September 6, 1881, the city of Aurora had no power, under the laws of this State, to grant the exclusive use of its streets to one company alone for telephone purposes. The title of the streets is vested in the city, and it holds such title in trust for the benefit of the public, and must hold and control the possession of the streets exclusively for public use. (*Pennsylvania Co.* v. *City of Chicago,* 181 Ill. 289). In *General Electric Railway Co.* v. *Chicago and Western Indiana Railroad Co.* 184 Ill. 588, we said (p. 595): "Whilst it is a legitimate use of a street to allow a steam railroad track to be laid and operated along or across it where there is legislative authority therefor, the railroad company can acquire no exclusive right in the street, nor is there power in the municipality to grant such exclusive use of a street to a railroad company." A city council has no power, under the City and Village act of this State, to grant an exclusive franchise to a private corporation to use its streets for the purpose of conducting and maintaining a telephone system in the city. Such an exclusive grant cannot prevent a city from granting to another corporation the privilege to occupy its streets for the same purpose. (*Clarksburg Electric Light Co.* v. *City of Clarksburg, supra*).

The city of Aurora, in view of its want of power to grant any exclusive right to the use of its streets for

telephone purposes by the appellant, made the reservation contained in section 3 of the ordinance of September 6, 1881, as above quoted.  By that section the city reserves to itself the right to grant authority to any other telephone company than the appellant to erect its poles and string its wires in the streets of Aurora "whenever requested, so as not to interfere with the right hereby granted to the Chicago Telephone Company, its successors and assigns." The right to grant the same privilege to another telephone company is coupled with the limitation that the right, granted to the appellant, is not to be interfered with.  What, then, was the right granted by the ordinance of September 6, 1881, to the appellant? Section 1 of that ordinance provides "that the Chicago Telephone Company, its successors and assigns be, and is hereby, granted the right of way through and upon the streets and alleys and public grounds of the city of Aurora, in the county of Kane, State of Illinois, for the uses and purposes therein and thereon, to erect, maintain and use all the necessary poles and posts of wood, iron or other suitable material and the necessary wires to successfully operate and use a system of telephones or telephone exchange in the city of Aurora," subject to certain provisions therein set forth, such as that the appellant's poles and posts shall be so set and its wires so placed as not to interfere with travel; and that the parts of the streets used by the appellant shall be kept by it in good order and repair; and that the city "may use said poles at any time for the purpose of fire alarm telegraph;" and that, whenever any of said poles shall become a nuisance, the common council may order its removal; and that the same shall be so set, as not to interfere with the flow of water in any gutter or drain; and that the points of location shall be determined under the direction of the committee on streets and alleys, or the street commissioner. Appellee, therefore, under its charter, had the right to construct its telephone system in the streets and alleys

of the city, provided it did not interfere with the right of appellant to erect and use all the necessary poles and wires to successfully operate and use a system of telephones or telephone exchange in the city.

The material question, therefore, is whether, under the evidence in this case, the appellee has so used and constructed its telephone system in the streets of the city of Aurora, as to interfere with the right of appellant to erect and use all the necessary poles and necessary wires to successfully operate and use its system of telephones. It necessarily results from the fact, that the city has a right to grant the privilege of operating a telephone system to different companies, ·that there will necessarily be some interference by one company with another. Wherever telephone companies occupy the public streets with their poles and wires, there will, as a matter of course, be some interference between them. The thing to be guarded against is such an interference as will prevent the practical operation of any one telephone system. In other words, it was and is the duty of appellee so to construct and use its telephone system, as not unnecessarily and unreasonably to interfere with the operation by appellant of its system. To grant any one company the exclusive right to use the streets would be to establish a monopoly. Joyce in his work on Electrical Law, (sec. 517,) says: "Upon the question of interference by the electric light wires of one company with the wires of another electrical company, the following general rule may be stated, being clearly sustained by the weight of authority. As between an electric light company and another electrical company, whether that company be a telegraph, telephone, or an electric light company, prior authority to occupy, or prior occupation of the streets, will not confer upon such company an exclusive right. The right of the prior licensee, however, must not be substantially invaded by the later company. Such subsequent licensee is under the duty to so maintain its wires

and lines, as not to interfere with the right of the prior occupant of the streets to properly maintain and operate its lines, and to transact the business it is authorized by its franchise to transact."

In the recent case of *Louisville Home Telephone Co.* v. *Cumberland Telegraph and Telephone Co.*, decided by the Federal Circuit Court of Appeals for the Sixth Circuit, (49 U. S. Cir. Ct. of App. 524,) where a telephone company constructed its line in the streets of a city under a franchise granted therefor, which expressly reserved the right to the city to grant similar rights to other companies, and thereafter a franchise was granted to a second company, which was required to construct its line under the direction of the board of public works, and such board required its line on certain streets to be placed on the same side and over the same space occupied by the first company, it was said by the court: "The circuit court appears to have accepted as correct the contention of the complainant that, by its prior occupation of the space which it occupied by erecting its poles, cross-arms, and wires over a width of eight feet and at the height of twenty-five feet, it acquired an exclusive right to occupy that width of space from the ground upward without limitation, and this without any intrusion by another party. * * * In this the court misconceived the nature and extent of the rights of the complainant. It may properly be conceded that its prior occupation of space, under the franchise granted by the statute and ordinance, would entitle it to continued enjoyment thereof, so long as it continued to perform its obligations, without substantial impairment. But its right is not absolutely exclusive. It is subject to such incidents as result from the exercise of the rights of other parties, who have acquired a valid franchise of similar character. It is implied in such grants, as were here made to the first company, that the grant is subject to such limitations, as will enable another company to enjoy a like franchise, and no property

right is invaded by the adoption of such measures by the second company, as will enable it to exercise its privilege, provided there is no unreasonable and unnecessary invasion of the operations of the first occupant. For the property right of the first is not to a monopoly. It is bound to exercise its privilege in such a way as to give room to another coming in under the power reserved. In the present case, the common council of the city expressly reserved the authority to grant to others, if it should deem it for the public interest, the same privileges in its streets as it granted to the complainant. * * * It is not intended, of course, to say that the first occupant may be despoiled, or the substance of its right appropriated. But this does not happen from merely giving place to a rival company, whose presence was expressly stipulated for by the contract, nor, probably, if the presence of the new party was the result of the exercise of a power reserved by implication in such a grant of privileges." (*Cumberland Telegraph and Telephone Co.* v. *United Electric Railway Co.* 42 Fed. Rep. 273; *Telephone Co.* v. *Railway Co.* 3 Am. Elec. Cas. 350; *Western Union Telegraph Co.* v. *G. & S. Light Co.* 46 Mo. App. 120; *Illinois Central Railroad Co.* v. *City of Chicago*, 141 Ill. 586). In *Illinois Central Railroad Co.* v. *City of Chicago*, *supra*, where a court of equity was asked to grant an injunction against interference with the operation of a railway at a street crossing, we said (p. 603): "It is well understood, that the track or right of way cannot, in the nature of things, be restored to the same state of usefulness with the street thereon, as before. It is to be restored, so as not to impair its usefulness more than is necessary in view of its use for the purposes of a street, subject to the use by the railroad company; it is not to be rendered less useful, except in so far as diminished safety and convenience are inseparable from its use by the public as a street crossing. It is not expected, that the crossing can be so restored as to obviate all danger, or delay, or inconvenience. It is

only necessary, that there should be no unreasonable impairment of the usefulness of the railroad right of way."

One of the interferences with appellant's system of telephone, which is charged against appellee, is that, in many of the streets of the city, appellee has erected its telephone poles and strung its telephone wires upon the same side of the street where the telephone poles and wires of appellant are set and strung, and that appellee has been guilty of overbuilding the poles and wires and telephone system of appellant; that is to say, that it has strung its wires above the telephone wires of appellant, instead of stringing them below the same. In other words, appellee is charged by appellant with "overbuilding" and "paralleling," as the terms are used by the expert witnesses.

If the city has no right to grant the exclusive use of the street to one telephone company, and has the right to grant the use thereof to two or more telephone companies, then the right of a later telephone company, coming into the street, to place its telephone lines upon the same side of the street with the telephone company coming earlier therein, necessarily results as a matter of course. There are only two sides to each street, and if there are more than two telephone companies, two of them must necessarily be on the same side of the street. If one telephone company has no right to the exclusive use of the street, it has no right to the exclusive use of one side of the street. In the case at bar, the evidence shows that, on many of the principal residence streets in the city, appellant has its poles and wires set and strung upon both sides of the street. Necessarily, therefore, in such cases the appellee was obliged to be, for a part of the route at any rate, upon the same side of the street with appellant. In the case already referred to of *Louisville Home Telephone Co.* v. *Cumberland Telegraph and Telephone Co. supra*, it appeared that the second company placed its line of poles and wires on the same side of the

street occupied by the first company, and this was there held to be no substantial interference with the rights of the first company. The right of the appellee to be upon the same side of the street with the appellant is substantially conceded by appellant in its bill, because it therein avers that "it was and is the duty of said Northwestern Telephone Company to so construct its lines, as not to unnecessarily interfere with the system and lines of your orator; that it was and is the duty of said defendant company in the construction of its lines, in cases where it is absolutely necessary to cross or parallel the lines of your orator, to underbuild the lines of your orator." This allegation is in effect an admission that, where it is absolutely necessary, appellee can parallel appellant's lines of wires, that is, can be upon the same side of the street with appellant.

Appellant, in addition to the contention that appellee should not be upon the same side of the street with it, contends that it should not overbuild appellant's telephone system, that is, that it should not, by the use of higher poles than those of appellant, string its wires above those of appellant. Appellant contends that appellee should underbuild, instead of overbuilding, that is, should string its wires under those of appellant, instead of stringing them over those of appellant. The testimony shows, that there are in the streets of Aurora some nine companies or interests, making use of the streets for the purpose of erecting poles and stringing wires, to-wit, appellant and appellee, the city arc light system, the city fire alarm system, the city police alarm system, the Western Union Telegraph Company, the Postal Telegraph Company, the Aurora Electric Light and Power Company, and the street railway company. The wires of the Aurora Street Railway, the Aurora Electric Light and Power Company, and the Aurora Electric Lights carry high potential currents of electricity, while the wires of the telegraph companies, of the city police

alarm and city fire alarm, and the wires both of appellant and appellee carry low potential currents of electricity. The proof shows that, in the proper construction of overhead systems of wires, the different high potential systems of wires should be placed on one side of the street by themselves, and the different low potential systems of wires should be placed on the other side of the street by themselves. The reason of this is, as stated by the different experts, that, if the wires of the high potential system drop and come in contact with the wires of a low potential system, the high potential current of electricity is thus conveyed from the high potential wires into the wires of the low potential system, and damage and injury to life and property are liable to follow such a contact. But if a wire, conveying a low potential current of electricity, drops down upon another wire, conveying a low potential current of electricity, no harm is ordinarily done, except that the two wires, forming a contact, disarrange the service of each, until the two wires are separated. Thus, if a wire of one telephone system drops upon a wire of another telephone system, the telephones along the lines of each of these two wires will not work properly, until the wires are separated. So, on the other hand, if a wire conveying a high potential current of electricity drops upon another wire conveying a high potential current of electricity, no particular harm is ordinarily done further than perhaps the burning of a fuse, or something of that kind. Inasmuch as the wires both of appellant and of appellee convey low potential currents of electricity, the dropping of the wire of one upon the other would do no particular harm. The evidence shows that, in many instances and on many streets, appellee overbuilt appellant's system, or strung its wires above those of appellant on the same side of the street with the appellant, because, if it had crossed the street with its wires and strung them on the opposite side of the street, it would have been obliged to string them

above wires, conveying high potential currents of electricity. This would lead to the risks and dangers necessarily arising from the falling of a wire conveying a low potential current of electricity upon a wire conveying a high potential current of electricity.

It is impossible for us, within the limits of this opinion, to discuss all the evidence in this immense record in regard to the various points of alleged interference, to which attention is called in the argument. We will only refer to one instance. When appellee constructed its system of poles and wires on Rathbone avenue in Aurora, it found that the city of Aurora had a line of poles, supporting its high potential city arc lights along the north side of the avenue for a distance of one-half or three-fourths of a mile; that appellant had overbuilt the city arc light wires along the entire north side of the avenue to a distance of about half a mile, and then its wires crossed from the north to the south side of Rathbone avenue, and continued along the south side a distance of six spans. The ordinance of August 7, 1899, under which appellee constructed its telephone system, provided that its work should be constructed under the supervision of the city electrician. The evidence shows that, wherever it has constructed its system, appellee has acted under the instructions of the city electrician. It was instructed by the city electrician to build its line along the entire south side of Rathbone avenue. When it came to the six spans where appellant, crossing over from the north to the south side of the avenue, had built its system on the south side of the avenue, it was obliged to overbuild the wires of appellant for the distance of this space of six spans. The direction of the city electrician, that appellee should build its line on Rathbone avenue on the south side of the street, compelled it to be on the same side of the street with appellant so far as the six spans in question were concerned, inasmuch as the latter were upon the south side of the avenue.

Appellee was obliged to overbuild rather than underbuild the appellant's telephone line for the distance of these six spans for the following reason: By section 2 of the ordinance of August 7, 1899, it was provided that appellee, its successors and assigns, "shall be subject to all ordinances now in force, or that may hereafter be passed, relative to the use of the public streets and alleys of said city," etc. On February 4, 1884, the city of Aurora passed an ordinance, providing as follows: "When such permission shall be granted by common council, the setting of such poles shall be under the supervision and direction of the committee on streets and alleys. The wires of such lines shall be placed on straight poles not less than thirty feet in height above the ground." Where appellant had erected its telephone system on the south side of Rathbone avenue for the distance of the six spans in question, it had used poles only thirty feet long, five feet of which were in the ground and only twenty-five feet above the surface thereof. It was, therefore, impossible for appellee to string its wires under those of appellant upon this avenue, or, in other words, it was impossible for it to use the system of underbuilding in view of the general ordinance of February 4, 1884, which required it to use poles not less than thirty feet in height above the ground. If it had adopted the system of underbuilding, it would have been obliged to string its wires at a distance of less than twenty-five feet from the ground. In other words, the requirement of the ordinance of February 4, 1884, that appellee should use thirty-foot poles, required it, in the case of Rathbone avenue, to overbuild rather than underbuild. The same state of facts exists at almost every point of alleged interference, as is thus shown to exist on Rathbone avenue. That is to say, appellee was obliged for a certain distance to be on the same side of the street with appellant because of the instructions of the city electrician, and it was obliged to overbuild rather than to underbuild, because appellant

had made use of poles only thirty feet long, five feet of which were underground.

Appellant complains that one of the dangers, resulting from the overbuilding of its wires by the wires of appellee, is that some wire of appellee is liable to break and fall down and come in contact with the appellant's wires; but, as we understand the evidence, such contact between the wires of appellee and appellant, both being wires of a low potential system, would be harmless, unless the same wire of appellee, at some other point in the city, should break and form a contact with a high potential wire, thus conveying the high potential current of electricity through the wire of appellee into the wire of appellant. In other words, one of appellee's wires must first come in contact with a high potential current of electricity at some place in the city, and, while that contact continues, the same wire of appellee must fall, and come in contact with some wire of appellant at a point where appellee's wires overbuild those of appellant. Thus, in order to produce the danger anticipated by appellant from the contact in question, two accidents must happen: one, that at some place in the city appellee's wire breaks and comes in contact with a high potential current; and second, that, when appellee's wire is so charged with such high potential current, it will break and fall upon the wire of appellant where it overbuilds the latter. The probability of these two accidents happening at the same time is too remote and uncertain to justify the issuance of an injunction against such overbuilding by appellee.

Complaint is also made that, at street crossings or intersections, appellee's wires would become interlaced with the wires of appellant. It is manifest that, where one street crosses another and upon both sides of both streets are poles and wires carrying both low and high potential currents of electricity, the wires must necessarily cross each other, and overbuilding and underbuild-

ing become absolutely necessary. There is no evidence in this record, that any system of wires in Aurora has ever interlaced with any other system, either of appellant or appellee or any other system of either a high or low potential current. The evidence tends to show that, at intersections where the poles of appellee, crossing the poles and wires of appellant, were of the same height as the poles of appellant, appellee's wires were enclosed in cables, and crossed the wires of appellant at these points in such cables several feet below the wires of appellant. In this way the danger of interlacing has been avoided.

A further contention is, that appellee has erected two or three distributing poles, as they are called, in the business district of the city on one side of a certain street or streets, and from the top of these poles has extended drop wires to high buildings on the opposite side of such street or streets for the purpose of extending its wires, so as to reach the business places of its subscribers; and that such drop wires will be likely to sag and fall down over the high potential wires on the opposite side of the street or the high potential trolley wires, and thus come in contact with the wires of appellant. The evidence shows, that these drop wires are placed so far above the wires of appellant, at a distance at some points of some ten or fifteen feet, that they could not sag or bend enough to reach appellant's wires directly below the tops of the distributing poles of appellee. It appears, however, that, if there was a possibility of such a result, it could be avoided by the placing by appellant of a system of guard wires, as they are called, directly above its top wires extending from one pole to another, so as thereby to secure protection against contact, by means of sagging, between the wires of appellant and the wires of appellee. There is evidence, tending to show that appellant refused to make use of these guard wires, or to permit appellee to place them in the proper position. It also appears from the evidence that appellee, in most

cases where it has wires dropped from the street to the houses of subscribers, uses what is known as a double twisted, duplex, insulated, hard drawn, copper wire; and that this insulation, in case of contact between one of the drop wires and some high potential wire and also a wire of appellant, would protect appellant from receiving the high potential current of electricity from the high potential wire. It is true that this insulation does not always secure the protection desired, but that a high potential current of electricity will pass through the insulation on wires is a mere possibility, and not a probability. It must also be observed that the buildings, into which the wires enter, are protected to a large extent by the use of what is known as fuses. A fuse is a piece of wire about six inches in length made of very soft material, which melts when it comes in contact with a high potential current of electricity. It appears from the evidence, that the wires of appellant are fused before they enter the houses of its different subscribers, so that, if a high potential current of electricity is conveyed to the wires of appellant, it is prevented from entering the building or switch-board at its central station by a double system of fuses, and is prevented from entering the building of a subscriber by a single fuse. It is true, as is shown by the testimony, that sometimes a high potential current of electricity has been known to jump one of these fuses without melting it, but the happening of such an occurrence, while possible, is not probable.

The ordinance of August 7, 1899, under which appellee has placed its poles and wires in the streets of the city, provides, in section 2 thereof, that "all such line or lines or other electrical conductors shall be placed in underground conduits within the 'fire limits' district, and outside said 'fire limits' district the said Northwestern Telephone Company may erect, maintain and operate a system of poles, wires and cables for the transmission of sound, signals and intelligence in all the streets, avenues,

alleys and other public ways in said city of Aurora."
But section 3 provides "that the said Northwestern Tele-
phone Company, its successors and assigns, shall for the
purpose of reaching and connecting its subscribers have
the right to bring said wires, cables or other electrical
conductors to the surface in every block located within
the 'fire limits' district, and maintain the same on such
poles as may be necessary to accomplish said purpose:
*Provided, however*, that in no case shall any wire, cable or
other electrical conductor be carried over ground beyond
the limits of the block within which they are brought to
the surface." The distributing poles in question were
located at the points, where the underground wires of
appellee emerged from its underground cable, and the
location of these poles by the appellee was made under
the direction of the city electrician and the chairman of
the street and alley committee. The evidence tends very
strongly to show, that these poles were so located and
constructed, and the drop wires from them so extended,
as to secure as great safety as possible, and to avoid as
much as possible the danger of contact, by sagging or
otherwise, with appellant's wires, or the wires of any
of the other systems in the street.

The appellant also complains that, in certain alleys
where appellant has a line of poles on one side of the
alley, appellee has constructed its line of poles on the
opposite side at the same height, and that the drop wires
from the tops of these poles of appellee, in crossing to
the subscribers on the side of the alley occupied by the
appellant, will pass through and interlace the wires of
appellant. The proof shows that, in such instances, the
appellee, in running one of its drop wires from the top
of its pole to a subscriber on the side of the alley occu-
pied by the appellant, runs such drop wire down its pole
to a point lower than the lowest lead of appellant, and
then from such point lower down on its pole runs its
drop wire beneath the lead wire of the appellant on the

opposite side of the alley.   This leaves an abundance of clearance between appellee's drop wires and the wires of appellant.   The course thus pursued is in accordance with the practice in such cases, and in accordance with approved telephone construction.

There is evidence showing that, if, in extending its line of poles and wires along one side of a street, appellee should cross. to the other side of the street, in order to avoid overbuilding appellant's wires, appellee would be obliged to make a bend in its line of wire in going from one side of the street to the other, and a second bend in continuing along the side of the street, to which the crossing was made.   According to the testimony, approved telephone construction requires that no more bends should be made in the wires than are necessary. In most cases where it is insisted by appellant that appellee should have crossed to the other side of the street, instead of placing its poles and wires on the same side of the street with appellant, appellee would have been obliged to place its wires directly above the high potential wires strung upon the opposite side of the street. The proof shows that it would be a violation of safe telephone construction to cross the street at such a point, and overbuild such high potential wires.

The proof shows also, that it is the common practice to overbuild systems of low potential wires with other systems of low potential wires.   Indeed, the second proviso of section 1 of the ordinance of September 6, 1881, which constitutes the appellant's authority to be in the streets of Aurora, provides "that the city of Aurora may use said poles at any time for the purpose of fire alarm telegraph."   Appellant was thus required by said ordinance to allow the city to use its poles for the purposes of a fire alarm telegraph.   It is conceded that the fire alarm telegraph carries a low potential current of electricity, and thus, by the very terms of appellant's ordinance, two systems of low potential wires are allowed

to be constructed upon the same line of poles. A zone has been defined to be an air space, so arranged that, in case of a breakage of any wire at any point, that wire would not come in contact with a wire of another system, either by being blown against it, or by falling directly on it by weight of gravity. Where two leads of wires are said to be in the same zone, they are in that proximate relation to each other that a contact is possible between the two systems by falling wires. While we have been referred to no case by counsel, where an injunction has been asked or granted restraining one low potential system of wires from using the same zone occupied by another low potential system, yet it cannot be presumed that the occupancy of the same zone by two low potential systems of wires is unlawful, in view of the fact that the practice of such occupancy is almost universally adopted in telephone construction. The record contains many instances where, in the city of Aurora, appellant has pierced and overbuilt lines of high potential wires. If appellant thus consents both to overbuilding and underbuilding in its relations with other companies constructing poles and wires in the streets of Aurora, it is difficult to see why it objects to the overbuilding of its line of wires on certain streets by the appellee. The proof tends to show that, in constructing its lines, the appellee has made use of safe and approved methods of construction, and that its construction, both as to its methods and location, has been approved by the city council of Aurora.

On December 20, 1900, the city council of Aurora passed a second ordinance, the first and second sections of which are as follows:

"Sec. 1. That all the acts of the Northwestern Telephone Company, which have been by it done under the provisions of an ordinance of this city, passed by the city council on the 7th day of August, A. D. 1899, and approved by the mayor of this city, August 12, A. D. 1899,

entitled 'An ordinance granting to the Northwestern Telephone Company certain rights in the city of Aurora,' and numbered 630, be and the same are hereby ratified, approved and confirmed by this council, and the license, grant, right and privileges by said ordinance granted to the Northwestern Telephone Company by name, are hereby expressly given and granted to the Northwestern Telephone Company, a corporation.

"Sec. 2. That in addition to such ratification of said acts of the said Northwestern Telephone Company and the re-grant herein made to said the Northwestern Telephone Company, it is hereby ordained that permission and authority be and the same is hereby granted to the Northwestern Telephone Company, its successors and assigns, to construct, operate, maintain and repair," etc., its telephone system.

The original ordinance, granting the franchise to the company, is inserted in the same words, as those used in the original ordinance, and the ordinance granting the second franchise was passed by a unanimous vote. At a meeting of the city council held on February 4, 1901, the following resolution was adopted unanimously, to-wit:

"*Resolved*, That we hereby approve and accept of the location and construction of the lines of poles and wires of the Northwestern Telephone Company * * * together with the location and construction of the two distributing poles," etc.

Even if it be true, as is charged by the appellant, that appellee did not in all respects follow the written permit, executed to it by the committee on streets and alleys, before it began the construction of its telephone system, yet such variation from the terms of the permit was cured by the subsequent approval of the city, and by the action of the appellee in obedience to the instructions of the city electrician and the committee on streets and alleys.

The fee of the streets is in the city. Cities are given exclusive control over the streets and alleys within their

corporate limits. It follows, as a general rule, that a court of equity will not interfere with the city's control over the use of its streets, unless the exercise of such power by the city is abused to the oppression of persons or corporations having rights in the street, or unless the action of the city in such respect is fraudulent or grossly wrong and unjust. (*Western Union Telegraph Co.* v. *Guernsey*, 46 Mo. App. 120; *City of Mt. Carmel* v. *Shaw*, 155 Ill. 37; *Canal Comrs.* v. *Village of East Peoria*, 179 id. 214).

There is evidence in the record tending to show, that the appellant itself offered a joint occupancy of its poles by itself and other persons and corporations, making use of the streets of the city, for the purpose of conveying currents of electricity.

While it is true that, in a certain sense, every case of overbuilding or underbuilding or joint occupancy is an interference, yet it is not necessarily an unnecessary and unreasonable interference. Appellant's right was not to operate its telephone system in Aurora free from any interference whatever, but so as to be free from unreasonable or unnecessary interference, or, in other words, such interference as would prevent the practical operation of its telephone system. After a careful examination of all the evidence, we are of the opinion that the construction of its poles and wires in the streets of Aurora for telephone purposes by the appellee has not been an unnecessary and unreasonable interference with the appellant's rights. Most of the dangers complained of by appellant are such as are necessarily incident to overhead construction, which takes place when more than one telephone system occupy the streets of a city. Appellant has not shown that there has been any serious injury inflicted upon it by the appellee. The injuries, of which it complains, are problematic in character, and the dangers which it fears are remote and improbable.

It is well settled that a court of chancery will not grant an injunction to allay the fears and apprehensions

of individuals, and will only grant protection against acts, which are not only threatened, but will in all probability be committed to the injury of the petitioner or complainant. (16 Am. & Eng. Ency. of Law,—2d ed.— pp. 360, 361).

In *Western Union Telegraph Co.* v. *Champaign Electric Light Co.* 1 Am. Elec. Cas. 822, it was held that courts will not interfere with the exercise by municipal authorities of their power to regulate the erection and maintenance of wires in the streets; that they will, however, in a proper case, as between two parties maintaining electrical wires in the streets, restrain the one which so places or uses its wires as to injure the other; but it was also held in the same case, that the danger from breaks and falling wires during storms is so uncertain and indefinite that a court cannot take that into consideration in determining the question whether an injunction should be issued. In *Louisville Home Telephone Co.* v. *Cumberland Telegraph and Telephone Co. supra,* it was said: "Mere inconvenience will not afford ground for complaint. The injury must be grave and unwarranted by the requirements necessary to such further exercise of the municipal authority in that direction as may be deemed expedient. The evidence in the record leaves no doubt whatever in our minds, that the inconveniences, likely to be suffered by the Cumberland company in consequence of the proposed construction by the Home company, are comparatively trivial. The affidavits of experts and practical men show that the practice of constructing a system of lines by one company above the lines of another is very common in many cities which are enumerated, especially where both are telephone systems, and no substantial inconvenience has been found to result. The city at all times has the power of regulation. It may not be arbitrarily exercised, but within reasonable bounds the city authority may rightfully designate in what manner the public interests require public services to be rendered, to the ex-

tent, at least, of determining in what part of a street the facilities shall be located, and presumptively this exercise of the police power is valid." The writ of injunction will "not be issued upon the bare possibility of an injury or upon any unsubstantial or unreasonable apprehension of it. The injury, too, must be real, not merely theoretical." (*Sherman* v. *Clark*, 4 Nev. 138; *Lorenz* v. *Waldron*, 96 Cal. 243; *Manufacturing Co.* v. *Railway Co.* 3 Am. Elec. Cas. 236).

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*